**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bienvenido DUARTE, Defendant–Appellant.**

No. 92–3417.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1993.

Decided Aug. 9, 1993.

Stephen J. Liccione, Asst. U.S. Atty., Office of U.S. Atty., Milwaukee, WI (argued), for plaintiff-appellee.

Thomas L. Shriner, Jr., Jeffrey N. Costakos (argued), Foley & Lardner, Milwaukee, WI, for defendant-appellant.

Before COFFEY and RIPPLE, Circuit Judges, and RONEY, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Bienvenido Duarte was charged with conspiracy to distribute more than 1 kilogram of cocaine in violation of 21 U.S.C. § 846, and with possession with intent to distribute more than 1 kilogram of cocaine in violation of 21 U.S.C. § 841(a)(1). A jury convicted him on both counts, and the U.S. district court sentenced him to two concurrent terms of 180 months in prison pursuant to the United States Sentencing Guidelines. On appeal, we affirmed his convictions but remanded for resentencing. *United States v. Duarte,* 950 F.2d 1255 (7th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992) (*"Duarte I"*). On remand, the district court conducted a new sentencing hearing and resentenced the defendant to two concurrent 180–month terms in prison.

Duarte appeals the resentencing. We affirm.

---

* Hon. Paul H. Roney, Senior Circuit Judge for the United States Court of Appeals, Eleventh Circuit, sitting by designation.

## I. The Conspiracy

We summarize the facts discussed in more detail in *Duarte I (see* 950 F.2d at 1257–58). On June 22, 1990, Milwaukee police received a tip from a reliable informant that the appellant and several co-conspirators had arrived in Milwaukee, Wisconsin, from New York City with a kilogram of cocaine. The informant advised that these individuals were staying in Room 234 of the Howard Johnson's motel at 1716 W. Layton Avenue in Milwaukee. Upon investigation, officers from the Milwaukee police department were able to uncover facts corroborating the informant's tip. They discovered that Room 234 had been rented five days earlier under the name of Maria Gonzales, who had given as her residence an address of a vacant, boarded-up home. Furthermore, a car parked immediately outside her motel room (234) bore New York license plates that were registered to another vehicle.

After placing Room 234 in the Howard Johnson's motel under surveillance, Milwaukee detectives Thomas Gorecki and Alan Wilke observed a man (later identified as Modesto Arroyo) leave the room and drive to a nearby Exel Inn at 1201 W. College Avenue, where he remained for about two hours before returning to the room in the Howard Johnson's motel.[1]

When the Milwaukee police arrested Arroyo, they found a key to Room 207 of the Exel Inn lying on the floor of his car. Uniformed officers entered this room to make sure no suspects were inside. Although detectives Gorecki and Wilke waited in the hallway, they could see a large brick of cocaine inside the room. The detectives then stationed officers outside this Exel motel room until they could obtain a search warrant. A search of the room pursuant to the warrant later uncovered drug paraphernalia and 1.177 kilograms of cocaine.

Meanwhile, Detectives Gorecki and Wilke returned to the Howard Johnson's motel, knocked on the door of Room 234, and were admitted by a man who identified himself as Antonio De La Cruz. Duarte was also present in Room 234 and gave the police permission to search the room. This consent search uncovered a pager with a New York phone number and a wallet containing notes written in Spanish that appeared to the officers to reflect large drug transactions. Duarte claimed ownership of the wallet and pager, but was both untruthful and evasive when questioned about his presence in Milwaukee.[2]

Duarte was arrested with Arroyo and charged with one count of conspiracy to distribute more than 1 kilogram of cocaine and with one count of possession with intent to distribute more than 1 kilogram.

At Duarte's trial, the government introduced expert testimony by DEA Special Agent William C. Hehr that the notes found in the defendant's wallet were drug ledgers that provided evidence of his responsibility for $117,000 worth of cocaine. *See Duarte I,* 950 F.2d at 1258. The case was submitted to a jury on November 16, 1990, and guilty verdicts were returned the same day.

## II. Issues

On January 22, 1991, the trial judge sentenced Duarte to two concurrent 180–month terms in prison on the basis of his responsibility for more than 5 kilograms of cocaine. On remand for resentencing on August 13, 1992, the court reimposed this sentence after again finding Duarte responsible for more than 5 kilograms.

In this appeal from resentencing, the defendant's brief concedes that his drug notes record transactions involving more than 5 kilograms of cocaine.[3] The remaining issue is whether the sentencing judge erred in finding that the defendant trafficked in this

---

1. Detectives Gorecki and Wilke had Arroyo under surveillance during four such round-trips.

2. Among other things, although Duarte claimed to be in Milwaukee to book singing acts, he knew of only one Milwaukee nightclub, was unable to name any Milwaukee singing acts, and gave police a false home address.

3. The defendant's brief states that, "for purposes of this appeal, Duarte does not challenge the [district court's finding that the transactions reflected in his notes totalled over 5 kilograms]. Nor does he dispute ... that the drug notes reflect drug transactions." Appellant's Brief at 10 n. 3.

cocaine as part of the same course of conduct as the Milwaukee drug conspiracy for which he was convicted.[4]

### III. The First Sentencing Hearing

Duarte's first sentencing hearing was conducted on January 22, 1991. The government's expert witness testified that Duarte's drug ledgers established his responsibility for $117,000 worth of cocaine in June 1990, when the going price in New York for a kilo of cocaine was approximately $20,000. The government divided the value of the defendant's cocaine ($117,000) by the kilo price he paid ($20,000) and determined that he was responsible for more than 5 kilograms during the time frame of the conspiracy. *See Duarte I*, 950 F.2d at 1262. The sentencing court disagreed with Duarte's claim that the evidence was insufficient to hold him responsible for any drugs other than the 1.177 kilograms of cocaine seized at the Exel Inn,

and it proceeded to sentence him on the basis of more than 5 kilograms of cocaine.

Pursuant to Guidelines §§ 1B1.3(a)(2) and 3D1.2(d), the sentencing courts are directed to "increase a defendant's base offense level to account for 'relevant conduct,' which includes drugs from any acts that 'were part of the same course of conduct or common scheme or plan' as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts." *Duarte I*, 950 F.2d at 1263 (quoting *United States v. Franklin*, 902 F.2d 501, 504 (7th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990)).[5] This so-called "aggregation rule" exposed Duarte to significantly harsher penalties than would otherwise have been applicable.[6] Because the government's conspiracy evidence concerning Duarte convinced the court that he was involved in more than 5 kilograms of cocaine, the Sentencing Guidelines assigned him a base offense level of 32 and a total

---

4. Duarte has filed a *pro se* "Motion to Object to Brief of Appeal" in which he objects to his attorney's failure to make several attacks on the validity of his conviction in this sentencing appeal. We rendered a final judgment affirming the defendant's conviction in *United States v. Duarte*, 950 F.2d 1255 (7th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992), and the defendant is therefore foreclosed by principles of res judicata from raising such issues now. *See United States Secretary of Labor v. Cerro Copper Products Co.*, 795 F.2d 25, 26 (7th Cir.1986).

Duarte also objects to his attorney's concession (found at 10 n. 3 of his brief) that his drug notes reflect more than 5 kilograms of cocaine. This concession was proper because Agent Hehr's testimony at resentencing on the amount of drugs attributable to Duarte's notes is uncontradicted. Finally, Duarte's motion also asserts that the trial court failed to address his "Motion in Opposition to Presentence Report" alerting the trial court to generalized "misinformation" allegedly within the report. The record discloses that this allegation is without merit. The transcript from the defendant's first sentencing hearing reflects that the sentencing court went over each of the defendant's objections to the presentence report individually and concluded by stating "I would adopt the factual statements contained in the presentence report as to which there are no objections. And to those which have been raised, the Court has resolved them [against the defendant]." In addition, a reading of the transcript makes clear that the trial court permitted the defendant to raise his objections again on

resentencing. Thus, the record is clear that the defendant's objections to the presentence report have been addressed, not once, but twice, and that in each instance the trial court found them to be without merit.

5. In the Sentencing Commission's Commentary to the Guidelines, two or more offenses are said to constitute part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, comment. (n. 9(A)) Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, comment. (n. 9(B)) Factors relevant to whether offenses are sufficiently connected or related to each other include "the degree of similarity of the offenses and the time interval between the offenses." *Id.*

6. Had the sentencing judge held the appellant responsible for only the 1.177 kilograms of cocaine that the police seized at the time of his arrest and the count he was charged and convicted of, he would have been assigned a base offense level of 26. Increasing the offense level by two points to reflect Duarte's supervision of the underlying conspiracy would have produced a total offense level of 28 for a sentencing range of 78–97 months. *See* U.S.S.G. § 2D1.1(c).

offense level of 34 [7] for a sentencing range of 151–188 months. *See* U.S.S.G. § 2D1.1(c).

## IV. *Duarte I*

This court remanded this case for resentencing on December 10, 1991, because it believed that the trial judge conceivably might have erred in calculating Duarte's base offense level on the basis of his responsibility for more than 5 kilograms of cocaine.

The *Duarte I* panel stated that it would reserve judgment on 1) whether Duarte was responsible for more than 5 kilograms of cocaine, and 2) whether the transactions recorded in his drug notes were part of the same course of conduct as the Milwaukee conspiracy. *See Duarte I*, 950 F.2d at 1266.

## V. Resentencing

At his resentencing hearing on August 13, 1992, the defendant argued that because the government failed to establish that his drug notes did not reflect hypothetical past drug deals in New York or other cities, it could not prove that his notes *were* connected to the Milwaukee drug conspiracy.

The government once again called upon its expert witness, DEA Agent Hehr, to interpret Duarte's drug notes. Testifying from the notes, Hehr initially described how the defendant had listed his income (from reselling cocaine in single-ounce and multi-ounce quantities) against his expenses (incurred in buying cocaine at wholesale prices). Hehr testified that these notations in the defendant's drug ledgers demonstrated transactions involving 291 ounces of cocaine, or 6.5 kilograms.[8]

The government also had Agent Hehr give a more detailed explanation of the basis for his opinion that the drug sales recorded in Duarte's notes were part of the same course of conduct as the crimes for which he had been convicted.

Agent Hehr testified that, based on his twenty years of experience in the infamous world of drugs, drug notes found in a dealer's wallet usually reflect current and local drug deals rather than old or distant ones, and the drug notes in Duarte's wallet at the time of his arrest thus relate to the Milwaukee drug conspiracy. According to Hehr, it would have been foolish for the defendant, an experienced drug dealer, to travel from city to city with old drug ledgers in his wallet due to the risk that his past dealings would be discovered if he were arrested. While drug traffickers in certain instances might keep ledgers of their current drug operations on their person in order to keep track of their drug debtors, an experienced dealer keeps records of past transactions in a secure hiding place, not on his person, and destroys them at the earliest possible moment.

Agent Hehr also testified and explained that, based on his research and knowledge of the going price of cocaine in Milwaukee and New York during the time frame of the Milwaukee conspiracy, it was clear that the drug prices listed in Duarte's notes were consistent with the then-current Milwaukee price of cocaine, but inconsistent with the then-current New York price.

For example, Agent Hehr interpreted an entry in Duarte's notes, "70 sinta A 850 Hacen $59500," as recording a single $59,500 sale of 70 ounces of cocaine priced at $850 per ounce. He then went on to testify that this $850 figure in the notes was consistent with Milwaukee multi-ounce prices at the time of the charged conspiracy in June 1990 but inconsistent with the lower cocaine prices prevalent in New York.[9] In the context of all the circumstances in this case, Hehr explained, these facts are convincing proof that the notes reflect cocaine sales made in the

---

**7.** The district court found that Duarte had supervised the conspiracy and thus imposed a two-point upward adjustment pursuant to U.S.S.G. § 3B1.1(c). Duarte does not challenge this upward adjustment.

**8.** Because the *Duarte I* panel had some doubts about the government's calculations at the first sentencing hearing, the government decided to use a different approach at resentencing. The

results are similar, and, as we will discuss later in this opinion, the quantity of cocaine reflected in the drug notes is no longer at issue.

**9.** Agent Hehr explained that a far greater supply of cocaine is available in New York because it is a "source city" for cocaine smuggled from abroad.

course of the defendant's June 1990 Milwaukee drug conspiracy.

The defendant's only challenge and response to this evidence was merely to dispute the credibility of Hehr's testimony.

Duarte argued, for example, that although the $850 figure in his notation "70 sinta A 850 Hacen $59500" might be consistent with Milwaukee multi-ounce prices, it was also consistent with New York single-ounce prices,[10] and that in fact it would make better economic sense to construe this entry as referring to 70 unrelated New York single-ounce sales.[11] The defendant, in his attempt to undermine Agent Hehr's testimony, pointed to the trial testimony of Detective Gorecki of the Milwaukee police, whose estimate of Milwaukee kilo prices was lower than the figure provided by Agent Hehr.[12]

After listening to the testimony and arguments of counsel, the district court once again concluded that the defendant's drug notes reflected transactions that 1) involved 5 or more kilograms of cocaine, and 2) were part of the same drug conspiracy for which the defendant had been convicted.

The court initially found that Duarte's drug notes, together with the expert testimony of Agent Hehr, demonstrated by a preponderance of the evidence that Duarte was responsible for 6.5 kilograms of cocaine.

The sentencing judge next turned to the question of whether there was enough evidence to find that the transactions involving

these 6.5 kilograms were part of the same course of conduct as the conspiracy for which Duarte was convicted. Here the court indicated that it was less impressed with Hehr's testimony that drug dealers do not keep old drug notes on their person when traveling than it was with his testimony that the prices in Duarte's notes reflected the cost of cocaine in Milwaukee during the same time period as the crimes for which the defendant was convicted. The court explained:

"Well, I know that I don't clear my wallet out every month, and I don't think you can draw any time conclusions really from what a guy carries in his wallet ... [but] ... I think that the difference in the market or going price of cocaine in either ounce quantities or multi-ounce quantities between New York and Milwaukee gives us a very strong indication that the transactions occurred in Milwaukee or in this geographical area and hence were a part of the conspiracy of conviction here rather than a conspiracy in New York or Boston or anywhere else Mr. Duarte may have been carrying on his business."

During his comments combined with his findings of fact, the district court stressed the credibility of the testimony offered by the government's expert witness. It stated that:

"Let the record show that the Court having studied carefully the mandate of the 7th Circuit and their concerns with reference to the calculation of the amount of cocaine that Mr. Duarte is responsible for

---

10. Hehr also testified that drug dealers typically offer customers a volume discount. Thus the per-ounce price of cocaine paid by a purchaser of a single ounce would be higher than the per-ounce price paid by a purchaser of 70 ounces, and, given the lower New York cocaine prices, a single, undiscounted ounce of cocaine in New York could be priced as low as the discount price offered to multi-ounce purchasers in Milwaukee.

11. Duarte argued that 70 ounces is slightly less than 2 kilograms of cocaine, and that, according to Hehr's own trial testimony, 2 kilos would sell in Milwaukee for between $48,000–$58,000. No one, Duarte argued, would purchase 70 ounces for $59,500 when they could purchase 2 kilos for $48,000–$58,000. Therefore, he concluded, in order to make economic sense, the entry "70 sinta A 850 Hacen $59500" must refer to 70 New York single-ounce transactions unrelated to the Milwaukee conspiracy.

This argument, raised for the first time at resentencing, proved to be unpersuasive not only to the sentencing judge, but also to us. For it is pure speculation to argue that *no* mid-level Milwaukee drug dealer would be willing to purchase cocaine from Duarte for $850 per ounce in order to resell it for $1,000 per ounce (the single-ounce price in Milwaukee during the time frame of the conspiracy according to Hehr's uncontradicted testimony at resentencing).

12. Whereas Agent Hehr testified at trial that his research showed kilos were selling for $24,000–$29,000 in Milwaukee in June 1990, Detective Gorecki had estimated at trial that a kilo would have sold for $15,000–$20,000. As we discuss later, this apparent disagreement is understandable given the fact that Gorecki was only familiar with drug prices in but one section of the city of Milwaukee.

and having the benefit of further testimony this day plus a good deal of clarification from both counsel and the witness, the Court is satisfied that Mr. Duarte was, in fact, a heavy cocaine dealer."

The district court also stated that it believed Agent Hehr's testimony regarding the known practices of sophisticated drug dealers, and that it found the defendant to fit that profile. In the district court's words:

"I was struck as I went over the notes and the history of the case again with the fact that this must have been a very sophisticated arrangement because Mr. Arroyo, who was the fellow that was actually in the actual presence of the cocaine, was totally separate from the man who brought it here—the different rooms and in different motels, and there was nothing that was particularly on its face incriminating except the notes in Mr. Duarte's hotel room.

"He consented to a search all of which is consistent in the Court's mind with a very—I hate to use the word professional in terms of cocaine distribution, but a sophisticated, experienced distributor of cocaine.

"I have no problem with the two-point enhancement that was assessed at the time of the original sentence for Mr. Duarte being a leader in the conspiracy."

Thus, based upon the totality of the evidence, the trial court again assigned Duarte a base offense level of 32 and a total offense level of 34, and resentenced him to 180–month concurrent terms in prison.

## VI. Discussion

We will not upset a trial court's application of the Sentencing Guidelines so long as the court has correctly applied them to findings of fact that were not clearly erroneous. *Duarte I,* 950 F.2d at 1262. Moreover, the factual finding at issue in this case—that Duarte's drug notes were part of the same conspiracy for which he was convicted—is resolved in the first instance by the district court's application of the preponderance of the evidence standard rather than the beyond-a-reasonable-doubt standard applicable to all elements of the crime itself. *Duarte I,* 950 F.2d at 1263.

Here the defendant offered no contrary evidence against which Agent Hehr's testimony might have been weighed. Yet Duarte's sole argument, at sentencing and on appeal, is that it would be clear error to give credence to Agent Hehr's testimony regarding the going prices of drugs in June 1990 and the factual inferences that may be made therefrom. According to the defendant, not only did Hehr have no reason to believe that the drug notes concerned the defendant's Milwaukee drug conspiracy rather than similar but unrelated drug conspiracies he may have been operating in New York, there was no reason to limit the possibilities to just those two cities. For example, Duarte argued that because he maintains a home in Lawrence, Massachusetts, and has recently visited Chicago, his notes might well refer to his separate drug operations in one of those cities. Such self-serving speculation seems designed to raise doubts in the mind of the trier of fact. But we are a court of appeals, and not a trier of fact, and we have held that "[t]he district court, as the trier of fact, not only has the authority but is in the best position to determine the amount of narcotics attributable to the conspiracy or any member of it." *United States v. Tolson,* 988 F.2d 1494, 1502 (7th Cir.1993).

In fact, we doubt that the appellant's tactic of challenging the prosecution to rebut each and every one of his speculative and hypothetical theories would succeed even if we were to apply the reasonable doubt standard at sentencing hearings rather than the preponderance of the evidence standard.

We have held that "[t]he view that the prosecution must answer *all* questions and remove *all* doubts ... of course is not the law because that would be impossible; the proof need only satisfy reasonable doubt." *United States v. Nesbitt,* 852 F.2d 1502, 1511 (7th Cir.1988) (quoting *Borum v. United States,* 380 F.2d 595, 599 (D.C.Cir.1967) (former Chief Justice Burger dissenting)).

Similarly, "[i]f the government proves its case by circumstantial evidence, 'it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable

doubt.' ... The trier of fact is free to choose among various reasonable constructions of the evidence." *Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)).

Nevertheless, in arguing that we must overturn the sentencing court's fact-finding in the present case, Duarte has adopted a strategy remarkably similar to that rejected by the former Chief Justice in *Borum:*

"[T]he mere existence of other possible hypotheses is not enough to remove the case from the jury:

'If the judge were to direct acquittal whenever in his opinion the evidence failed to exclude every hypothesis but that of guilt, he would preempt the functions of the jury. Under such a rule, the judge would have to be convinced of guilt beyond peradventure of doubt before the jury would be permitted to consider the case. That is not the place of the jury in criminal procedure. They are the judges of facts and ... not merely a device for checking upon the conclusions of the judge.' "

*Borum*, 380 F.2d at 599 (former Chief Justice Burger, dissenting) (quoting *Curley v. United States*, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947)).

Of course, in the sentencing aspect of the case before us, the government is not required to satisfy the reasonable doubt standard of proof; rather, it only must meet the preponderance of the evidence standard.

We hold that the district court addressed the concerns the panel expressed in *Duarte I*. First, it is undisputed that Agent Hehr has 20 years of experience investigating, analyzing, and testifying concerning drug operations such as the one directed by Duarte. An educated professional, Hehr's formal training with the DEA has been supplemented, if not exceeded, by his training and experience on the streets during the course of hundreds of undercover assignments and thousands of interviews of drug suspects. His record, as far as we can discern, is unblemished. He testified in this case solely in his capacity as an expert witness who had had no involvement whatsoever in the partic-

ular investigations that led to the defendant's arrest.

Second, Hehr's testimony is entirely plausible. Certainly the district court was acting within the core of its fact-finding powers when it found this veteran agent's testimony regarding Milwaukee and New York drug sales data to be more credible than the alternative, speculative and self-serving theories put forth by the defense, theories asserted without a thread of supporting testimony or evidence. A sentencing judge's determinations of credibility are entitled to great deference on review. *United States v. Beal*, 960 F.2d 629, 634 (7th Cir.1992).

Finally, as we noted earlier, the defendant finds it highly significant that Detective Gorecki's trial testimony regarding Milwaukee drug prices differed from Agent Hehr's testimony. But we see nothing unusual in the trial court's finding that Hehr's expert testimony was entitled to more weight than Detective Gorecki's good faith, but non-expert, estimate of Milwaukee drug prices. Agent Hehr's testimony (that Milwaukee drug prices during the relevant time period were consistent with those in Duarte's drug notes) was based not only upon his broad experience and knowledge, but also upon his detailed research. Detective Gorecki, on the other hand, did not claim to have undertaken any such research. Moreover, while the conspiracy at issue in this case took place on the south side of a large metropolitan city, the detective's expertise, according to Hehr's uncontradicted testimony at resentencing, was limited to the drug prices charged in one small section of the City of Milwaukee—the north side:

Q: Now you know Detective Gorecki, right?

Hehr: Yes, I do.

Q: He's pretty knowledgeable about the drug trade, isn't he?

Hehr: Detective Gorecki's expertise lies on the north side of Milwaukee, yes, but he's very, very knowledgeable.

The trial judge, after hearing the testimony of both officers, obviously found Agent Hehr's testimony to be more convincing and more credible and thus relied on it. We have

stated before that the sentencing judge "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *United States v. Tolson,* 988 F.2d at 1497 (quoting *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir. 1992)).

In applying the clearly erroneous standard, we will not reverse a sentencing judge's factual determination unless it is "without foundation." *United States v. Blas,* 947 F.2d 1320, 1328 (7th Cir.1991) (quoting *United States v. Jordan,* 890 F.2d 968, 972 (7th Cir.1989)). In the case before us, a rational fact-finder could well have been persuaded by Agent Hehr's testimony that Duarte's drug notes reflected June 1990 Milwaukee cocaine prices and therefore were part of the same course of conduct that led to his June 1990 Milwaukee arrest for trafficking in 1.177 kilograms.[13]

In summary, mindful that in reviewing the factual findings of a sentencing court we apply the clearly erroneous standard, we conclude that the district court has satisfactorily addressed the *Duarte I* panel's concerns on remand. The sentencing judge determined (and the appellant's brief concedes) that there was sufficient evidence before the court to find by a preponderance of the evidence that Duarte's drug notes reflected transactions involving more than 5 kilograms of cocaine. The court also found that the testimony of the government's expert witness established by a preponderance of the evidence that these transactions were part of the Milwaukee conspiracy for which the de-

fendant was convicted. Neither factual finding was clearly erroneous.

For the foregoing reasons, Duarte's sentence is

AFFIRMED.

---

**13.** As already discussed, Agent Hehr also testified on resentencing that drug notes found on experienced drug dealers are virtually certain to reflect current and local sales rather than old or distant ones. Although not necessary to our decision to affirm in this case, we think this expert testimony, when *combined* with the other evidence in this case, provides further support for the district judge's finding that the drug transactions reflected in Duarte's notes were part of his ongoing

conspiracy to distribute cocaine in the Milwaukee area. Evidence that might be insufficient when considered in isolation may become quite relevant when considered in light of all the other evidence. As we cautioned last term, "Although ... each piece of evidence *alone* may not support a finding, [we must] consider the *aggregate effect* of the evidence presented to the district court." *United States v. Villarreal,* 977 F.2d 1077, 1080 (7th Cir.1992) (emphasis added).