32 F.3d 570
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Myrtle M. WILLIAMS, Defendant-Appellant.
 No. 90-3389.
 United States Court of Appeals, Seventh Circuit.
 Argued April 22, 1994.
Decided Aug. 26, 1994.
 
 Before POSNER, Chief Judge, and COFFEY and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Defendant Myrtle M. Williams appeals her conviction on five counts of mail fraud, 18 U.S.C. Sec. 1341, challenging the sufficiency of the evidence, the credibility of witnesses, and allegedly erroneous jury instructions. We hold that the evidence met the standards of sufficiency and credibility to sustain her conviction, and that the jury instructions were proper. We Affirm.
 
 I. BACKGROUND
 
 2
 Gamzo Associates ("Gamzo") was a non-profit social service organization founded for the purpose of assisting troubled youth on the South Side of the City of Chicago, Illinois. Myrtle Williams was executive director of Gamzo, and contracted with the State of Illinois Department of Children and Family Services ("DCFS") to provide services to troubled youth. Gamzo received eighty-eight percent of its revenue from DCFS.
 
 
 3
 It was agreed between the parties that Gamzo would bill DCFS for its services on an hourly basis. DCFS permitted Gamzo counsellors to bill for time spent in youth counseling, court appearances, and time spent filling out clinical progress reports on an individual youth's case.[1] Barbara Randall, a DCFS supervisor, testified that generally after spending fifty minutes with a child, a counsellor would take ten minutes filling out the clinical progress report. During the years in question, 1984 and 1985, Gamzo contracted with DCFS to provide services under three different contracts; the Unified Delinquency Intervention Services ("UDIS"), Illinois Status Offenders Project ("ISOS"), and Comprehensive Community Based Youth Services ("CCBYS").[2]
 
 
 4
 Monthly service report forms for each counsellor were sent to DCFS billing for the time a counsellor spent on each youth's case. Gamzo's secretaries filled out the monthly reports from a compilation of the daily activity sheets of each counsellor. The secretaries generated one monthly report for each counsellor for each separate contract with DCFS,[3] because not all counsellors provided services under all three contracts. The defendant Myrtle Williams signed a voucher accompanying each report attesting to the accuracy of the report and requesting reimbursement for the time and expenses allowed and incurred under each contract.
 
 
 5
 Deborah Franklin, a former Gamzo employee and one of the prosecution's witnesses, testified that the monthly service reports were routinely falsified at the insistence of the executive director, Williams, with a greater number of hours being charged than had actually been worked. Franklin, Priscilla Lee, Dorothy Spurlock, and other former employees, testified that when they filed the monthly reports, the defendant would return the sheets and tell the workers to "bill more hours" or "bill the max." The executive director's mandate to "bill the max" referred to DCFS's own maximum limits on counselling time. The ISOS and UDIS contracts, provided for a maximum number of hours a counsellor could spend per week on each child. DCFS also limited the number of weeks a child could remain in a program without special authorization. Often times throughout 1984 and 1985 Williams directed Franklin to falsify the billing by adding hours to the amount each counsellor spent with an individual child to reach the DCFS maximum allotted time a counsellor could spend with a child. This was done, in spite of the fact that the counsellor had not spent that much time in counselling the child, thus allowing Gamzo to receive the maximum amount of money from DCFS.
 
 
 6
 Williams controlled all of the details of the payroll decisions; she kept the records which determined how much pay the counsellors were to receive and she authorized all payroll checks. The payroll funds came from Gamzo's operating budget, which was primarily composed of DCFS funds. Gamzo employees testified that if they failed to inflate their hours as the defendant instructed, Williams would punish the employee either by "short[ing]" their checks through reducing the number of hours they were paid as opposed to the number of hours worked, or in some cases, refusing to forward a timely payroll check. In each instance, it was not that the counsellors failed to work the required number of hours to earn their salary, but the defendant was punishing them for refusing to inflate their DCFS billable hours.
 
 
 7
 Dorothy Spurlock, Gamzo's former administrative assistant, testified that her duties included writing checks for day-to-day business expenses, organizing the UDIS and ISOS program monthly reports, and filing counsellors' daily activity reports as well as the counsellors' monthly service reports. These monthly service reports were supposed to accurately reflect only the amount of time the counsellors spent in counselling, in court hearings, travel to and from those activities, and counsellors' time spent filling out clinical progress reports of their individual clients (youths). Spurlock's primary job was to take each counselor's daily activity reports and compile them into a monthly service report for each client. However, when Spurlock would turn the monthly reports over to the defendant, the defendant would instruct Spurlock to include additional hours to reflect the clerical time Spurlock spent in compiling these monthly reports.[4] Thus, the reports not only reflected the inflated time that the counsellors spent with clients and filling out clinical progress reports, but also the clerical time Spurlock spent in preparing the monthly service reports, billed as if her time was spent in counselling activities. The charge for clerical time in preparing the monthly service reports was not authorized under Gamzo's contracts with DCFS because this clerical expense was calculated into the amount of money DCFS reimbursed Gamzo for counsellors' time.[5] Once Spurlock's time was included in the monthly reports, Williams would again return the reports to Spurlock instructing her to "bill the max" to insure that Gamzo reached the maximum allowable number of billable hours.
 
 
 8
 After a few months of this overbilling, the defendant, in an attempt to remove herself from participation in as well as current knowledge of the existence and scope of the fraud, instructed both Franklin and Spurlock not to "bother" her any further with each counselor's daily activity sheets. Williams did this in order to shield herself from knowing the actual number of hours worked, and the total amount overcharged. But she still continued to instruct Spurlock and Franklin to "max out" the time allotted to be billed under each contract.
 
 
 9
 In addition to the above-mentioned false billing practices, Williams instructed her counsellors to count non-billable administrative time as if it were time spent in counselling activities.[6] Williams knew this was prohibited because she had attended a DCFS meeting in 1984 which instructed her on proper billing procedures, and also, on the twenty percent allowance for administrative costs factored in to the DCFS contracts.
 
 
 10
 Barbara Randall was a DCFS supervisor in charge of monitoring accounts, during 1984 she reviewed Gamzo's monthly statements and noticed several recurring inaccuracies. For example, the reports filed revealed that children were spending more than the allotted number of weeks in counselling, and that some counsellors were charging in excess of eight hours per day per child. Miss Randall contacted both Franklin and Spurlock and brought this to Gamzo's attention. Subsequently, Williams instructed Randall not to speak to anyone in her organization other than herself on questions about billings. Randall, a state employee familiar with normal DCFS auditing procedure, testified that this direction to speak only with Executive Director Williams was quite unusual, and that the normal practice was to speak to the individual who fills out the monthly reports.
 
 
 11
 In July of 1985, Georgeann Hamilton became the UDIS manager at DCFS, and contacted Gamzo about visiting their offices to inspect their books. When Hamilton visited Gamzo, the defendant informed her that the records she requested were at a different location. This statement concerning the location of the records later proved to be untrue. Hence, Hamilton was unable to review and inspect the billing records during her initial visit.
 
 The DCFS Audit
 
 12
 By letter dated August 30, 1985, DCFS notified Gamzo that they would be auditing all of its books and records. The audit began on September 5, 1985 with a conference between the defendant and the audit team to discuss the purpose and scope of the audit. On October 3, 1985, the chief auditor, Mauriece Graham notified the defendant that certain records, discussed at the meeting on September 5, still had not been turned over to the auditing team. Graham found it necessary to repeat his request in writing on two more occasions, and threaten legal action before the defendant turned over the records on October 10, 1985.
 
 
 13
 The audit of Gamzo's monthly service reports indicated the Gamzo was billing for time in excess of eight hours per day.[7] Upon discovering these billing irregularities, DCFS terminated the contracts with Gamzo on October 28, 1985.
 
 DCFS Findings and Court Testimony
 
 14
 The DCFS audit uncovered numerous unsubstantiated disbursements; including the defendant Myrtle Williams' inflated salary, which was set by Gamzo's Board of Directors in the budget at $40,500, but according to the auditors was actually $58,044.13. The amount overpaid included undocumented reimbursements for travel and supplies, a $16,400 in "payroll advance" never reimbursed, and a reimbursement for William's tax shelter annuity payment[8] much higher than the amount the defendant actually paid. Further, the auditors discovered twenty-six separate automated teller machine (ATM) withdrawals of $100 each, drawn from the Gamzo account, without supporting documentation for any of the withdrawals. The uncontroverted testimony of the Gamzo employees indicated that Myrtle Williams was the only person who had access to the ATM card.
 
 
 15
 The audit also reflected that Gamzo leased a 1984 Ford Mustang and improperly used DCFS funds to pay for it.[9] The testimony at trial established that the car was used exclusively by the defendant and was never used for any counseling related purposes. It was also testified that Gamzo used DCFS money to purchase a large screen television and a video cassette recorder, which were kept at the defendant's home, and utilized for her personal use only. None of these items were used by Gamzo for any counselling purposes.
 
 Criminal Proceedings
 
 16
 Myrtle Williams was indicted September 6, 1989 on five counts of mail fraud in violation of 18 U.S.C. Sec. 1341 for using the postal system to perpetrate a fraud on DCFS. In spite of all the evidence, Williams, at trial argued that she was not in charge, nor was she aware of the fraud being perpetrated. Counsel for the defendant gave as an excuse that any person who works in business has to have a certain amount of trust in their own employees without having to check everything that the employee reports. Based on this argument on the defendant's behalf, the government requested that the judge give the jury the 'ostrich' or conscious avoidance instruction at the close of the trial.[10] The defense attorney objected, claiming that there was insufficient evidence in the record to warrant the giving of the instruction. The court ruled that the defense counsel had opened the door to the charge by arguing that the defendant was charged with a crime because she relied on the truthfulness of others. On May 10, 1990, after 14 days of trail the jury returned guilty verdicts on all five counts of mail fraud.
 
 II. ISSUES
 
 17
 Defense counsel presents two arguments for reversal of Williams' conviction. Initially, counsel argues there was insufficient credible evidence presented to sustain a conviction for mail fraud. The purported basis for this claim is that several Gamzo employees were given immunity for their testimony, and therefore were free to lie about the defendant's role in the scheme. Second, defense counsel argues that the giving of the "ostrich instruction" was clear error because of a lack of sufficient evidence in the record to support an inference that the defendant consciously avoided guilty knowledge.
 
 III. DISCUSSION
 
 18
 A. Sufficiency of the Evidence and Credibility of the
 
 Witnesses
 
 19
 Williams contends that the evidence presented was insufficient to establish her guilt beyond a reasonable doubt on all five mail fraud counts. When reviewing challenges to the sufficiency of evidence supporting a conviction, we review the evidence presented at trial in the light most favorable to the government. If we conclude that any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt, we will reject the defendant's sufficiency challenge. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Dortch, 5 F.3d 1056, 1065 (7th Cir.1993). cert. denied, 114 S.Ct. 1077 (1994). Unless the evidence adduced is "contrary to the laws of nature ... or is so improbable on its face that no reasonable factfinder could accept it, we will not reweigh the evidence or evaluate the credibility of witnesses." United States v. Wilson, 94-1148, slip op. at 4. (citations omitted). See also; United States v. Beverly, 913 F.2d 337, 358 (7th Cir.1990), cert. denied, 498 U.S. 1052 (1991). We defer to the jury's weighing of the witnesses' credibility because the jury, the trier of fact, had the best opportunity to "observe the verbal and non-verbal behavior of the witnesses, focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements," as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record. United States v. Duarte, 1 F.3d 644, 651 (7th Cir.1993) (citations omitted), cert. denied, 114 S.Ct. 724 (1994).
 
 
 20
 Defense counsel argues that there was insufficient "credible" evidence to sustain a conviction on the five counts of mail fraud. Defendant's argument is merely a challenge to the credibility of "unreliable" government witnesses, an argument that is "wasted on an appellate court." United States v. Hartmann, 958 F.2d 774, 780 (7th Cir.1992). At trial, several key witnesses, including Barbara Randall, Deborah Franklin, Priscilla Lee and Dorothy Spurlock, established that Myrtle Williams frequently directed that they and other Gamzo employees falsify the counsellors' monthly service reports to reflect a greater number of hours being billed to DCFS than were actually spent with the individual children. The evidence from Franklin and Spurlock demonstrated that Williams, after giving the orders to falsify DCFS billings, deliberately attempted to remove herself from guilty knowledge of the fraud, by insulating herself from direct involvement in falsifying the counselors' daily time reports. The testimony of Barbara Randall, a DCFS worker not associated with Gamzo nor given immunity, testified that Williams directed her not to speak to any Gamzo employee, except Williams herself, regarding billing. This arrangement raised suspicions in Randall because the normal practice was to direct billing questions to those responsible for compiling the monthly reports. From the evidence at trial, this order from the defendant could be construed as another piece of evidence to support the fraud charges. The defendant making herself the sole source of information to the DCFS, coupled with her instructions to her employees to inflate billing, her unexplained ATM withdrawals, her payroll advances (inflating her salary), the unauthorized leased car and video equipment, and her non-cooperation with the DCFS audit, all amount to evidence of her intent to defraud.
 
 
 21
 Defendant's sufficiency of the evidence argument fails primarily because a rational trier of fact could indeed find the defendant guilty beyond a reasonable doubt based on the testimony of these employees. While it is true that the Gamzo employees were given immunity from prosecution, their testimony revealed that none of the former Gamzo employees materially benefitted in any way from the fraud perpetrated at Gamzo. To the contrary, if the employees and counsellors refused to inflate their hours and falsify their billings, the defendant would either "short" their paychecks or delay payment.
 
 
 22
 It was the defendant alone who benefitted: it was the defendant whose salary was much higher than contracted for; and it was the defendant who made a number of ATM withdrawals (26 totalling $2600) without any explanation or receipts. These benefits, along with the TV and VCR, the leased car, and the tax shelter reimbursement, came directly out of funds received from DCFS through Gamzo's overbilling. Further, Mauriece Graham, a DCFS auditor, established that Myrtle Williams acted intentionally to interfere with DCFS's audit of Gamzo billing.
 
 
 23
 Based on the direct and circumstantial evidence and the documentation of the mail fraud presented at trial, we hold that the evidence was sufficient to support a conviction for the five mail fraud counts.
 
 B. JURY INSTRUCTIONS
 
 24
 The defendant also contends that the trial court erred in giving the 'ostrich' instruction to the jury based on a claim of conscious indifference. In this case, defense counsel argued in opening statement that others in business similarly situated to the defendant, had the right to rely on the honesty of others in executing their duties:
 
 
 25
 If you work for a corporation, you have a right to rely on the honesty of your employees. If you are the president and the chief operating officer of the corporation, you have the right to rely on the honesty of your employees. If the board of directors that supervised you hires a C.P.A. firm to audit the books and records, if they hire an accountant to reconcile the checking account and make the ordinary day-to-day bookkeeping entries. (Trial Tr. at 104).
 
 
 26
 During the jury instruction conference the government requested that the court give the 'ostrich' instruction based on the defense's opening statement combined with the testimony of Gamzo employees Franklin and Spurlock who repeated the defendant's instructions on how to inflate the hours billed and afterward instructed them not to bother her with the accuracy of daily billing reports. Defense counsel argued that there was no evidence to support the government's request to administer the ostrich instruction. The court ruled that the inference of deliberate ignorance had been raised in the defense's opening statement, and that the government's request for the ostrich instruction would be granted.
 
 
 27
 We note as a preliminary matter that "jury instructions must be reviewed in their entirety and be taken as a whole. 'As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal.' " United States v. McNeese, 901 F.2d 585, 607 (7th Cir.1990) (quoting United States v. Fournier, 861 F.2d 148, 150 (7th Cir.1988)); see also United States v. Ruiz, 932 F.2d 1174, 1179-1180 (7th Cir.), cert. denied, 112 S.Ct. 151 (1991); United States v. Durades, 929 F.2d 1160, 1167 (7th Cir.1991).
 
 
 28
 The district court judge instructed the jury:
 
 
 29
 "You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a defendant had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut her eyes for fear of what she would learn, you may conclude that such defendant acted knowingly. To sustain the charge of mail fraud the government must prove the following propositions:
 
 
 30
 First, that the defendant knowingly devised the scheme to defraud as described in the indictment...."
 
 
 31
 The purpose of the ostrich instruction is to alert the jury to the fact that the act of avoidance of knowledge of particular facts may itself demonstrate sufficient guilty knowledge to satisfy the elements of the crime, i.e., mail fraud. This instruction, like all instructions, whether requested or made sua sponte, should be given only when the court rules it addresses an issue reasonably raised by the evidence. "A conscious avoidance instruction is 'properly given only when a defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.' " United States v. Diaz, 864 F.2d 544, 549-50 (7th Cir.1988) (citing United States v. White, 794 F.2d 367, 371 (8th Cir.1986)), cert. denied, 490 U.S. 1070 (1989). An 'ostrich' instruction is only appropriate when "the defendant claims a lack of guilty knowledge and there are facts and evidence that supported inference of deliberate ignorance." United States v. Bigelow, 914 F.2d 966, 970 (7th Cir.1990), cert. denied sub nom. Vaughan v. United States, 498 U.S. 1121 (1991). This "deliberate indifference" can be the result of a "mental, as well as a physical effort--a cutting off of one's normal curiosity by an effort of will." United States v. Giovannetti, 919 F.2d 1223, 1229 (7th Cir.1990).
 
 
 32
 The defense argument clearly presupposes the defense that Myrtle Williams relied, to her detriment, on the dishonesty of others, without any knowledge of their actions. The evidence to the contrary presented at trial was overwhelming. Based on the numerous instances of monetary indiscretion, the ostrich instruction was properly given as the evidence presented at trial established Williams' endeavor to consciously avoid guilty knowledge of the deception at Gamzo. In her effort to withdraw from active participation in the fraud after she had set the scheme in motion, Williams attempted to remove herself from knowledge of the true extent of Gamzo's fraud by instructing Franklin and Spurlock not to "bother" her with the counsellors' daily reports. Thus, viewing the evidence in the light most favorable to the government, there was sufficient evidence presented for the "ostrich" instruction to be given in this case. While the defendant did not take the stand and testify that she was unaware of the fraud perpetrated by Gamzo employees, the testimony of her former employees and that of Barbara Randall, establishes that they believed Myrtle Williams did indeed attempt to insulate herself from guilty knowledge by directing others to inflate billable hours while she avoided active participation in the inflated billing. There was no error in the court's decision to administer the ostrich instruction.
 
 IV. CONCLUSION
 
 33
 The overwhelming facts and evidence presented at trial more than support the jury, the rational trier of fact, could have found the defendant guilty beyond a reasonable doubt. Further, the defense counsel opened the door in his opening statement the district court properly administered the 'ostrich' instruction.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Included in Gamzo's fees were a twenty percent allowance, authorized by DCFS, for administrative costs, to cover secretarial time, overhead, and other miscellaneous costs
 
 
 [2]
 The UDIS and ISOS contracts were "purchase of services contracts" where Gamzo was paid for each unit of measurable work. These units of measurable work were based on the hours spent by the counselors with each individual youth. The CCBYS contract, was also a purchase of services contract, but it contained a bonus provision which provided that if Gamzo counsellors billed ninety percent of a targeted number of hours, Gamzo received a flat fee which was higher than the total amount they would have received under hourly billing. The targeted number of hours involved the total of all the Gamzo counsellors' billable time in a given month, but as we discuss infra at 5, there was a maximum number of hours a counsellor could spend with each individual youth in a given week
 
 
 [3]
 As explained above, Gamzo was providing services for DCFS under three separate contracts: the UDIS, the ISOS, and the CCBYS
 
 
 [4]
 The clerical time spent filing out daily activity sheets and monthly service reports is not reimbursable under the DCFS contracts. In contrast, the counsellors' time spent filling out clinical progress reports on clients is reimbursable
 
 
 [5]
 DCFS budgeted into its contracts a twenty percent allowance for administrative overhead (e.g., telephones, clerical salaries, supplies ...), thus for every counsellor hour billed to DCFS, 20% would cover administrative expenses of the organization (Gamzo)
 
 
 [6]
 As explained above, counsellors could bill for time spent filling out clinical progress reports, but they could not bill for time spent on clerical activities
 
 
 [7]
 For the contracts and months charged in the indictment, United States Postal Inspector Marian Day, who participated in the investigation because the charges involved mail fraud, reviewed the number of hours charged by Gamzo to individual workers on the monthly service reports and compared those to the hours the counsellors documented on their daily activity reports. She found that Gamzo had billed DCFS in August of 1984 for 133 hours of clinical progress report writing time but the counsellors' daily activity sheets indicated they spent only 40 hours writing clinical progress reports. Moreover, on three separate monthly statements Gamzo had charged for 24 3/4 hours, 27 1/2 hours, and 35 hours, for counselling by a single counsellor, in three eight-hour work days
 
 
 [8]
 This was a deferred compensation plan in place at that time which would be similar to today's Individual Retirement Accounts
 
 
 [9]
 Gamzo was only authorized to charge DCFS for mileage related to counselling services provided for DCFS and not for Williams personal use
 
 
 [10]
 The Ostrich Instruction states:
 "You may infer knowledge from a combination of suspicious and indifference to the truth. If you find that a defendant had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut her eyes for fear of what she would learn, you may conclude that such defendant acted knowingly. To sustain the charge of mail fraud the government must prove the following propositions:
 First, that the defendant knowingly devised the scheme to defraud as described in the indictment;"