UNITED STATES of America,
Plaintiff–Appellee,

v.

John M. HAMILTON, a/k/a John Nord-
quist, and Robert J. Miller, a/k/a Robert
J. Alexander, Defendants–Appellants.

Nos. 93–2166, 93–2167.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1993.

Decided March 21, 1994.

Timothy O'Shea, Office of U.S. Atty., Madison, WI, (argued), for U.S.

Andrew A. Sultze, Feingold, Bates & Sultze, Janesville, WI (argued), for Robert Miller.

Thomas J. Coaty, Madison, WI (argued), for John M. Hamilton.

Before BAUER, FRIEDMAN * and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The defendants, John Hamilton and Robert Miller, were convicted of aggravated bank robbery in violation of 18 U.S.C. § 2113(a) & (d). The district court sentenced them to 190–month and 158–month prison terms, respectively, and ordered them to pay $25,035 in restitution. The defendants now appeal. For the reasons that follow, we affirm.

## I

### BACKGROUND

On the morning of March 12, 1992, the defendants broke into the back door of a bank in rural Burnett County, Wisconsin. They ordered, at gunpoint, the two tellers to open the vault and to lie down on the floor. The robbers then proceeded to make off with over $22,000. Shortly thereafter, Mr. Hamilton and his wife, Monica Hamilton, and Mr. Miller and Jennifer Miller[1] fled by automo-

---

* The Honorable Daniel M. Friedman, of the United States Court of Appeals for the Federal Circuit, is sitting by designation.

1. Although Jennifer Miller referred to herself at trial as Mr. Miller's wife, the government contended that the two were not legally married because Jennifer Miller had not been divorced

bile to Arizona. They engaged in a spending spree along the way. The defendants were eventually arrested in Arizona on May 6, 1992.

At the time of this arrest, Messrs. Hamilton and Miller were not taken into federal custody. They were arrested on outstanding warrants for violating their probation in Minnesota and Nevada, respectively. While Mr. Hamilton was an inmate in a Minnesota state prison, he confided to fellow inmate William Albee that he had been involved in the Burnett County bank robbery. Albee then informed the FBI. As a result, Mr. Hamilton and Mr. Miller were indicted on September 10, 1992 for bank robbery in violation of 18 U.S.C. § 2113(a), and for carrying a firearm during a violent crime in violation of 18 U.S.C. § 924(e). A superseding indictment was returned on December 2, 1992 charging the defendants with one count of aggravated bank robbery under 18 U.S.C. § 2113(a) & (d).

While awaiting trial on the federal charge, Mr. Hamilton once again befriended a fellow inmate. Failing to learn from his first mistake, Mr. Hamilton told the inmate, Alan Wildman, all the details of how he and Mr. Miller had robbed the Burnett County bank. He also disclosed his intention to murder an FBI agent and his family when he was released from prison. This time, however, Mr. Hamilton had more than just his story to tell; he had discovery materials in his prison cell that his attorney had left with him to peruse. Mr. Hamilton showed Wildman the discovery materials, and the two men began to formulate and discuss trial strategies, including plans to fabricate perjured testimony and evidence. However, Wildman decided to offer the government his testimony concerning the activities of Mr. Hamilton and Mr. Miller because he feared that Mr. Hamilton was actually going to carry out his planned murder of the FBI agent.

On February 12, 1993, the district court held a pretrial evidentiary hearing on the admissibility of the testimony of Albee and Wildman concerning Mr. Hamilton's extrajudicial statements, and on Mr. Miller's motion for severance of the defendants' trials. The district court held that Wildman was not acting as a government agent when Mr. Hamilton disclosed the information about which Wildman was to testify, and that, because Mr. Hamilton voluntarily disclosed the information, he had waived any attorney-client privilege he had concerning the information. The government was therefore not prohibited from using the information either before or at trial. The district court also held that using Mr. Hamilton's extrajudicial statements against Mr. Miller presented no Confrontation Clause problem because those statements were admissible against Mr. Miller under Federal Rule of Evidence 804(b)(3).

On March 3, 1993, after a six-day trial in which neither defendant took the stand, a jury found both defendants guilty. On May 4, 1993, Mr. Hamilton was sentenced to a 190–month prison term; Mr. Miller was sentenced to a 158–month term. The district court ordered the defendants to pay the bank $25,035 in restitution.

## II

## DISCUSSION

On appeal, Mr. Hamilton makes only one argument: that the government's use of his trial strategy, as discovered through Mr. Hamilton's cellmate, Alan Wildman, denied Mr. Hamilton his Sixth Amendment right to effective assistance of counsel. Mr. Miller raises four additional arguments.[2] First, he submits that the privilege covering marital communications was violated by admitting portions of Jennifer Miller's testimony. Second, Mr. Miller contends that his Sixth Amendment right of confrontation was violat-

---

from her prior husband before her marriage to Mr. Miller. As a result, the district court determined that Mr. Miller could not assert a marital communications privilege with respect to certain portions of Jennifer Miller's testimony. Mr. Miller raises this issue on appeal, and it is discussed below. *See infra* Part II.B.1.

**2.** Mr. Miller also adopts the Sixth Amendment argument presented in Mr. Hamilton's brief. Assuming *arguendo* that Mr. Miller has standing to assert Mr. Hamilton's Sixth Amendment claims for himself, we cover this aspect of Mr. Miller's appeal in our discussion concerning Mr. Hamilton.

ed when the extrajudicial statements of his codefendant, Mr. Hamilton, were admitted against him at trial. Third, and relatedly, Mr. Miller argues that the district court abused its discretion in not severing his trial. Finally, Mr. Miller asserts that the district court's finding that Mr. Miller could have reasonably foreseen that Mr. Hamilton had a firearm during the bank robbery is clearly erroneous. We now examine each defendant's contentions.

## A. *John Hamilton*

Mr. Hamilton contends that Alan Wildman's disclosure of and testimony about the trial tactics he discussed with Wildman in their prison cell, which included information relating to discovery material, violated his Sixth Amendment right to effective assistance of counsel. He argues that, to guarantee that right and to maintain the adversarial character of the criminal justice system, we must ban all forms of prosecutorial access to defense strategy and tactics. Mr. Hamilton does not contend on appeal that Alan Wildman was in any way a government agent. Rather, he urges us to adopt a prophylactic rule that would prohibit the government from using or introducing at trial any sensitive defensive plans it learned about in any way.

Mr. Hamilton attempts to ground his proposed rule in *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In that case, the plaintiff brought a § 1983 action because a government undercover agent had attended several meetings between Bursey, when he was a criminal defendant, and Bursey's attorney. The Supreme Court found no unlawful interference with attorney-client relations in violation of the Sixth Amendment because, among other reasons, the government agent involved had not disclosed to other government officials "trial plans, strategy, or anything having to do with the criminal action pending against plaintiff." *Id.* at 548, 97 S.Ct. 837. Mr. Hamilton concedes that no government agent was involved in his case. Nevertheless, he submits that the prejudice in his case resulting from the actual disclosure of his trial secrets to the government more than compensates for the lack of a government actor. In Mr. Hamilton's view, the main point of *Weatherford* and cases following it is that the Sixth Amendment is violated when prejudice results from the government's use of privileged information. *See, e.g., United States v. Dien,* 609 F.2d 1038, 1043 (2d Cir.1979) (stating that to establish a Sixth Amendment violation after *Weatherford* a defendant must establish "that privileged information had been passed to the government or that the government had intentionally invaded the attorney client relationship, and resulting prejudice").

We cannot accept Mr. Hamilton's argument. To the extent that he bases his argument on the attorney-client privilege, he has made no effort whatsoever to show that the information used allegedly in violation of the Sixth Amendment was privileged attorney-client information. *See United States v. White,* 950 F.2d 426, 430 (7th Cir.1991) ("The burden falls on the party seeking to invoke the [attorney-client] privilege to establish all the essential elements."). However, regardless of whether Mr. Hamilton could demonstrate that the information Wildman obtained through their prison cell communications was privileged, Mr. Hamilton waived any such privilege when he voluntarily disclosed the confidential information to his cellmate. *See Powers v. Chicago Transit Auth.,* 890 F.2d 1355, 1359 (7th Cir.1989) ("Any voluntary disclosure by the holder of the attorney-client privilege is inconsistent with the attorney-client confidential relationship and thus waives the privilege."). To the extent that Mr. Hamilton urges us to adopt a prophylactic rule based not on the attorney-client privilege but rather on the need to maintain the adversarial nature of a criminal proceeding, we decline to do so. Any such rule would be in derogation of the truth, much like the attorney-client privilege itself. *See United States v. White,* 970 F.2d 328, 334 (7th Cir. 1992). This consideration militates strongly against the adoption of Mr. Hamilton's proposed prophylactic rule. *See id.* ("[T]his circuit has repeatedly held that [the attorney-client privilege] must be strictly confined."); *United States v. Lofton,* 957 F.2d 476, 477 (7th Cir.1992) ("Evidentiary privileges must be construed narrowly to protect the search for truth.").

## B. *Robert Miller*

### 1.

Mr. Miller's first contention is that the district court erred in not excluding certain portions of Jennifer Miller's testimony that he claims fell within the marital communications privilege. Shortly after returning home from the bank robbery, Mr. Miller informed Jennifer Miller that he and Mr. Hamilton had just robbed a bank. Mr. Miller claims that, at the time, he thought Jennifer Miller to be his lawful spouse. The district court allowed Jennifer Miller to testify about Mr. Miller's statement over Mr. Miller's objection because Mr. Miller failed to present evidence demonstrating that a valid marriage existed between the two. The district court had requested the offer of proof in a pretrial order because questions arose concerning whether Jennifer Miller was legally divorced from her first husband at the time she married Mr. Miller in Nevada. Mr. Miller now asserts that the district court abused its discretion in admitting this damaging testimony because the government never proved that the marriage did not exist, and because, in any event, Mr. Miller made the communications at issue in reliance on his good faith belief that he and Jennifer Miller were validly married. We review the district court's ruling under the abuse of discretion standard. *See Lofton,* 957 F.2d at 477 (stating that we review a district court's decision regarding the existence of an evidentiary privilege for abuse of discretion).[3]

■ Mr. Miller's arguments are misplaced. The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all the essential elements involved. *White,* 950 F.2d at 430. When a question arose at the pretrial evidentiary hearing concerning the validity of Mr. Miller's marriage to Jennifer Miller, the district court properly instructed Mr. Miller in a subsequent pretrial order to be prepared to prove the validity of the marriage at trial if he planned on asserting

the marital communications privilege. *See United States v. Byrd,* 750 F.2d 585, 593 (7th Cir.1984) (stating that "only communications that take place during a valid marriage ... are protected by the privilege"). However, when Jennifer Miller testified at trial and Mr. Miller objected based on the privilege, he failed to make the required proffer for which the court had given him notice. Thus, Jennifer Miller's subsequent voir dire testimony stating that she had never been divorced from her previous husband justified the district court's decision to rule that her testimony was not protected by the marital communications privilege.

■ Mr. Miller argues in the alternative that, even if Mr. Miller and Jennifer Miller were not validly married, the district court should have excluded the confidential communications because Mr. Miller made them to Jennifer Miller in reliance on his belief that they were validly married. We need not address this argument at length. Our cases make clear that we "interpret[ ] strictly the 'valid marriage' requirement in the testimonial privilege context." *Id.* (citing *United States v. Clark,* 712 F.2d 299, 302 (7th Cir. 1983); *United States v. Van Drunen,* 501 F.2d 1393, 1397 (7th Cir.), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974)). Like other evidentiary privileges, the marital communications privilege is "in derogation of the truth." *White,* 970 F.2d at 334. For these reasons, we are not inclined to extend the privilege to cases in which a valid marriage does not exist. We therefore hold that the district court correctly held the marital communications privilege not to apply to any of Jennifer Miller's testimony.

### 2.

Mr. Miller next asserts a Sixth Amendment Confrontation Clause violation. He claims that the district court erred by admitting the extrajudicial statements of his codefendant, Mr. Hamilton, against him at trial. He asserts as an absolute proposition that

---

**3.** *See also United States v. Koen,* 982 F.2d 1101, 1114 (7th Cir.1992) (stating that the abuse of discretion standard "means that we shall not second-guess the decision of a trial judge that is in conformity with established legal principles and, in terms of its application of those principles to the facts of the case, is within the range of options from which one could expect a reasonable trial judge to select").

"where two defendants are tried jointly, the pre-trial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." Appellant Miller's Br. at 6. He submits that the district court erred in concluding that incriminating statements made by Mr. Hamilton were admissible against him under Federal Rule of Evidence 804(b)(3), which excepts statements made against the declarant's interest from the general prohibition against hearsay.[4] As a result, Mr. Miller asserts, the admission of Mr. Hamilton's extrajudicial statements in his trial violated his right of cross-examination under the Confrontation Clause as set forth in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In response, the government argues that Mr. Miller's *Bruton* contention is misplaced. In its view, the district court was correct in deeming Mr. Hamilton's extrajudicial statements to be admissible against Mr. Miller under Rule 804(b)(3). *Bruton,* the government states, dealt only with a confession used at a joint trial against the declarant-codefendant that was not admissible against the nondeclarant-codefendant under any hearsay exception.

■ Mr. Miller's argument displays a misperception, albeit a common one, of the Supreme Court's holding in *Bruton.*[5] *Bruton* concerned a declarant-codefendant's confession that was admitted only against the declarant at the joint trial of the declarant and his codefendant Bruton. *Id.* at 124–25, 88 S.Ct. at 1621. In *Bruton,* the government did not attempt to use the confession against Bruton because, under the prevailing rules of evidence, it was inadmissible hearsay. Indeed, the trial court gave an appropriate limiting instruction that the statement could not be used against Bruton. Nevertheless, the Supreme Court held that, "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining [Bruton's] guilt," Bruton's confrontation rights were violated. *Id.* at 126, 88 S.Ct. at 1622–23. However, the Court expressly reserved the question whether such a violation occurs when the extrajudicial statements are admissible against the declarant's codefendant under an exception to the hearsay rule:

> We emphasize that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence.... There is not before us, therefore, any recognized exception to the hearsay rule insofar as petitioner is concerned and we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause.

*Id.* at 128 n. 3, 88 S.Ct. at 1623–24 n. 3. In short, *Bruton* does not address the issue before us in this case. Previous cases in this circuit, however, have, and those cases present the rule of decision that must govern the case before us today.

In *United States v. York,* 933 F.2d 1343 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991), we addressed a *Bruton* claim similar, though not identical, to the one Mr. Miller presents. In *York,* the defendant contested the district court's admission of incriminating extrajudicial statements made by York's partner, Mahar. Mahar had told two acquaintances that Mahar and York were planning to burn down a business for insurance proceeds. Mahar was unavailable at York's trial because she had died in the very blaze for which York

4. Rule 804 states in relevant part:
   **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
   ....
   **(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true....

5. *See* James B. Haddad & Richard G. Agin, *A Potential Revolution in* Bruton *Doctrine: Is* Bruton *Applicable Where Domestic Evidence Rules Prohibit Use of a Codefendant's Confession as Evidence Against a Defendant Although the Confrontation Clause Would Allow Such Use?,* 81 J.Crim.L. & Criminology 235, 239 (1990) ("A common misperception is that *Bruton* interpreted the Confrontation Clause so as to prohibit the use of a codefendant's confession or admission as evidence against a defendant.").

was on trial. We held that admitting the testimony against York was not precluded by *Bruton*. Unlike the declarant's statement in *Bruton*, Mahar's statement was admissible against York under a hearsay exception, Rule 804(b)(3). *Id.* at 1362–64. We held that the statement made against the penal interest of Mahar was sufficiently reliable to justify its use against York. In reaching that decision, however, we cast the governing rule cautiously:

> So long as the incriminating and inculpatory portions of a statement are closely related, if the circumstances surrounding the portion of a declarant's statement inculpating another are such that the court determines that the inculpatory portion of the statement is just as trustworthy as the portion of the statement directly incriminating the declarant, there is no need to excise or sever the inculpatory portion of the statement. Mahar's inculpatory statements were admissible under Rule 804(b)(3) and therefore there was no confrontation clause violation.

*Id.* at 1364. In *United States v. Curry*, 977 F.2d 1042 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993), we acknowledged with approval the holding in *York*. In *Curry*, the district court allowed the government to present an informant's testimony concerning incriminating statements codefendant Bush had made. *Id.* at 1055. Because the testimony was admissible under Rule 804(b)(3), we held that *Bruton* did not preclude the admission of the evidence at the joint trial because *Bruton* dealt with inculpatory statements that were inadmissible against the nondeclarant-code-

fendant. As Mr. Miller correctly points out, the district court in *Curry* gave a limiting instruction stating that Bush's extrajudicial statements would be admissible only against Bush. *See id.* However, we do not read the decision as turning on this point. Once it ruled that the testimony was excepted from the general prohibition against hearsay by virtue of Rule 804(b)(3), the district court in *Curry* need not have given such a limiting instruction.[6] Rather, it appears that the government should have been able to use the declarant-codefendant's extrajudicial statements against the nondeclarant-codefendant.[7]

In *United States v. Clark*, 989 F.2d 1490 (7th Cir.1993), we again recognized, albeit in dicta, the vitality of the approach announced in *York*. In that case, the codefendant Griffen claimed a *Bruton* violation because the testimony of codefendant Clark's sister concerning extrajudicial statements made by Clark were not sufficiently redacted. We held that no Confrontation Clause violation occurred because Clark himself eventually took the stand. *Id.* at 1498. Nevertheless, we also observed that both the government and the defense may have overread *Bruton*:

> We note that it is possible that no *Bruton* problem truly exists in this case. In [*York*] and [*Curry*], we held that admitting statements which were admissible as statements against penal interest under Fed. R.Evid. 804(b)(3) did not violate the defendants' Confrontation Clause rights. It appears that Mr. Clark's statements to his sister would meet the requirement of Rule 804(b)(3), thus eliminating any *Bruton* con-

---

**6.** Indeed, if the statement had been inadmissible against Curry under the prevailing rules of evidence, the existence of a cautionary instruction would have been, as *Bruton* itself demonstrates, of questionable value. We also note that the cautionary instruction in *Curry* may well have been based on other considerations. The district court had forbidden the parties to refer to Roger Curry as the ringleader of the group. In footnote 9 of its opinion, the panel in *Curry* noted that the "district court did not abuse its discretion when it denied Roger's motion for mistrial and instead cautioned the jury that the statements of Bush may only be held against him and not any of the other defendants." *Curry*, 977 F.2d at 1056 n. 9.

**7.** Mr. Miller similarly invites our attention to *United States v. Chrismon,* 965 F.2d 1465 (7th

Cir.1992). In that case, Mr. Miller states that we based our holding that there was no *Bruton* violation on the fact that the extrajudicial statement of Chrismon's codefendant Jackson did not identify codefendant Chrismon, but rather required additional evidence and inference to implicate Chrismon. *See id.* at 1473. We made no mention, he asserts, of the possibility that a codefendant's extrajudicial statements could be admitted against another codefendant at their joint trial under Rule 804(b)(3). Mr. Miller is correct, and for good reason—the extrajudicial statement of Jackson failed to inculpate Chrismon and therefore could not have been admitted against him to demonstrate guilt.

cerns; however, the government did not raise this issue. *Id.* at 1499 n. 6. Accordingly, we conclude that *Bruton* affords Mr. Miller no protection if Mr. Hamilton's extrajudicial statements were admissible under Rule 804(b)(3).[8]

■ We therefore examine whether the statements of Mr. Hamilton were admissible under Rule 804(b)(3). In order to determine the admissibility of hearsay under this Rule, we apply a three-part test: A "'court must find that, (1) the declarant's statement was against the penal interest of the declarant, (2) corroborating circumstances exist indicating the trustworthiness of the statement, and (3) the declarant was unavailable.'" *United States v. Gio,* 7 F.3d 1279, 1288 (7th Cir.1993) (quoting *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990)).

The first and third parts of our Rule 804(b)(3) test are easily met in this case. First, Mr. Hamilton's extrajudicial statements were plainly against his penal interest, and Mr. Miller fails to demonstrate otherwise. As in *York,* 933 F.2d at 1362–63, the context in which Mr. Hamilton made his extrajudicial statements has been recognized by the advisory committee as one that passes Rule 804(b)(3) muster. This is not a case in which Mr. Hamilton made his statements to gain favor with law enforcement officials; rather, he made them to a cellmate with whom he was on friendly terms, and with whom he discussed his legal strategy at length. The Advisory Committee Note to Rule 804(b)(3) states:

> Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.... On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying.

With respect to the last part of the Rule 804(b)(3) test, Mr. Hamilton was unavailable because he asserted his Fifth Amendment right not to testify at trial.

The second part of our Rule 804(b)(3) test requires somewhat closer scrutiny. Mr. Miller argues that Mr. Hamilton's statements are untrustworthy and unreliable because they amount to nothing more than "jailhouse boasting." Although we are aware that inculpatory and incriminating statements can sometimes be nothing more than bravado, we do not think the district court abused its discretion in finding Mr. Hamilton's extrajudicial statements trustworthy. A review of the record reveals that the extrajudicial statements Mr. Hamilton made to Alan Wildman, including those portions inculpating Mr. Miller, were corroborated by other government witnesses, including Jennifer Miller, whom Wildman has never met. Finally, the incriminating portions of Mr. Hamilton's extrajudicial statements were closely related to the inculpatory portions. *See York,* 933 F.2d at 1364. Mr. Hamilton's incriminating statements against his interest were replete with tightly woven references to Mr. Miller's inculpating role in their joint activities. We therefore hold that the district court did not abuse its discretion in admitting Mr. Hamilton's extrajudicial statements against Mr. Miller.

### 3.

■ Mr. Miller's next contention is that the district court erred in denying his severance motion. On appeal, Mr. Miller must show that the district court's decision was an abuse of discretion. *See United States v. Smith,* 995 F.2d 662, 670 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 718, 126 L.Ed.2d 683 (1994). Moreover, Mr. Miller must show that, in abusing its discretion in

---

**8.** *See also United States v. Gio,* 7 F.3d 1279, 1289 (7th Cir.1993) (stating that "we have already determined that the statements were properly admitted as statements against interest under Rule 804(b)(3). The same evidence that was discussed as providing sufficient corroborating evidence also satisfies the required indicia of reliability for Confrontation Clause purposes."); *York,* 933 F.2d at 1363 ("Notwithstanding the advisory committee's understandable caveat that it did not purport to suggest that requirements for admissibility under Rule 804(b)(3) would satisfy the confrontation clause, we think that such statements satisfy those requirements.").

not severing his trial, the district court actually prejudiced him by depriving him of a fair joint trial. *See id.* To show actual prejudice, Mr. Miller must demonstrate that one of the following circumstances was present in his case:

> (1) conflicting and irreconcilable defenses; (2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; (3) a codefendant's statement that incriminates the defendant; and (4) a gross disparity of evidence between the defendants.

*Clark,* 989 F.2d at 1499.[9]

█ Mr. Miller bases his argument for severance on the third circumstance set out in *Clark*—i.e., that codefendant Hamilton's extrajudicial statements incriminated him. Mr. Miller thus presents as grounds for severance the same *Bruton* arguments we have already rejected. We need not revisit this issue. Suffice it to say that, because the statements were properly admitted against Mr. Miller under Rule 804(b)(3), they can hardly constitute grounds for asserting that the district court abused its discretion in denying his severance motion, much less that its decision amounted to actual prejudice.

### 4.

█ Finally, Mr. Miller submits that the district court erred in increasing his offense level by five levels under U.S.S.G. § 2B3.1(b)(2)(C) when it found that he could have reasonably foreseen that his codefendant was carrying a firearm during the robbery. He acknowledges that we review findings of fact in the Guidelines application context only for clear error, and that the preponderance of the evidence standard applies to such factual findings, not the beyond a reasonable doubt standard. *United States v. Duarte,* 1 F.3d 644, 649 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). Nonetheless, he asserts

that the district court had no accurate information upon which to have made the determination that Mr. Hamilton even carried a firearm in the course of the robbery, much less that Mr. Miller could have reasonably foreseen that Mr. Hamilton would do so.

█ We do not agree with Mr. Miller's assessment of the evidence before the district court. First, with respect to whether Mr. Hamilton was bearing a firearm during the robbery, Mr. Hamilton's cellmate, Alan Wildman, testified that Mr. Hamilton had told him that he had taken with him to the bank a .357 magnum, which he had stuck into the waistband of his pants. Tr. at 4–90, 4–96. Further, the bank tellers testified that the robbery involved weapons, although they were unable to specify what type of gun each robber had used. Mindful of the fact that a "sentencing judge's determinations of credibility are entitled to great deference on review," *id.,* 1 F.3d at 650, we conclude that this was enough evidence for the district court to find by a preponderance of the evidence that Mr. Hamilton carried a firearm in committing the robbery.

Second, we cannot say that the district court lacked a basis for finding that Mr. Miller could have reasonably foreseen that Mr. Hamilton would carry a firearm with him in committing the bank robbery. *See id.* at 651 (stating that, in applying the clearly erroneous standard, "we will not reverse a sentencing judge's factual determination unless it is 'without foundation'") (quoting *United States v. Blas,* 947 F.2d 1320, 1328 (7th Cir. 1991), *cert. denied,* — U.S. —, 112 S.Ct. 1234, 117 L.Ed.2d 468 (1992)). Jennifer Miller testified at trial that Mr. Miller had informed her shortly after the robbery that Mr. Hamilton had carried a gun during the robbery. Tr. at 3–A–21. It was not clearly erroneous for the district court to deem her testimony credible and find as a factual matter that Mr. Miller was aware or should have been aware that his compatriot was armed;

---

**9.** As the Supreme Court has recently stated:
There is a preference in the federal system for joint trials of defendants who are indicated together. Joint trials "play a vital role in the criminal justice system." They promote efficiency and "serve the interests of justice by

avoiding the scandal and inequity of inconsistent verdicts."
*Zafiro v. United States,* — U.S. —, —, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993) (quoting *Richardson v. Marsh,* 481 U.S. 200, 209–10, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987)).

this is particularly so in light of the fact that Jennifer Miller's testimony was corroborated on this point in large part by Alan Wildman's testimony.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.