85 F.3d 632
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
John M. HAMILTON, also known as John Nordquist, Defendant-Appellant.
 No. 95-3141.
 United States Court of Appeals, Seventh Circuit.
 Submitted April 9, 1996.*
Decided May 13, 1996.
 
 Before BAUER, FRIEDMAN** and RIPPLE, Circuit Judges.
 
 ORDER
 
 1
 Defendant John Hamilton was convicted of aggravated bank robbery and sentenced to 190 months' imprisonment. His conviction and sentence were affirmed by this court on appeal. United States v. Hamilton, 19 F.3d 350 (7th Cir.1994). Hamilton then moved for a new trial on the grounds that new evidence showed that (1) one of the government's witnesses, a fellow inmate, acted as a government "agent" when he obtained information about Hamilton's trial strategy and passed this information on to law enforcement officials, and (2) another government witness recanted testimony she had given nearly two years earlier at Hamilton's trial. The district court denied Hamilton's motion, and Hamilton appeals. We affirm.
 
 BACKGROUND
 
 2
 On March 12, 1992, Hamilton and codefendant Robert Miller broke into the back door of a small bank in Burnett County, Wisconsin, held up two tellers at gunpoint, and escaped with $23,000. Soon thereafter, Hamilton and his wife Monica, along with Robert and Jennifer Miller,[1] fled to Arizona. After engaging in a spending spree along the way, defendants were eventually arrested in Arizona in early May 1992.
 
 
 3
 Hamilton was taken into Minnesota state custody for violating an outstanding probation warrant there. While incarcerated in a Minnesota state prison, Hamilton confided to another inmate, William Albee, that he been involved in the Wisconsin bank robbery. When Hamilton failed to repay a debt to Albee, Albee contacted FBI Special Agent Jack Schulte and passed on what Hamilton had told him about the Wisconsin bank robbery.
 
 
 4
 Hamilton and Robert Miller were indicted in September 1992 for bank robbery in violation of 18 U.S.C. § 2113(a), and using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Under a superseding indictment that was returned in December 1992, Hamilton and Miller were charged with one count of aggravated bank robbery. 18 U.S.C. § 2113(a) and (d).
 
 
 5
 Hamilton awaited trial on the bank robbery charges at Dane County Jail in Wisconsin, where he became acquainted with fellow inmate Alan Wildman. Wildman, too, faced federal charges; he had been charged with distribution of cocaine and conspiracy to possess and distribute cocaine. As he had done with inmate Albee in Minnesota, Hamilton entrusted Wildman with the details of his robbery of the Wisconsin bank. Hamilton apparently viewed Wildman, a white, middle-aged dairy farmer, as the type of person he would likely encounter on a Wisconsin jury. (R. 91, at 150; R. 132, at 100.) Unlike his prison stay in Minnesota, however, Hamilton accumulated discovery materials in his Dane County prison cell that his attorney had left with him to review. How Wildman happened to learn of the contents of these materials is disputed. Hamilton insisted that Wildman, acting in the capacity as a government agent, stole these materials and passed on the information to the FBI. Wildman, on the other hand, maintained that Hamilton volunteered information about the facts of his case and used him as a sounding board to discuss and plan trial strategy. Wildman subsequently shared the contents of these discussions with the FBI, purportedly because he feared that Hamilton would carry out a stated threat of killing FBI Special Agent Jack Schulte and Schulte's family once he was released.
 
 
 6
 In February 1993, the district court conducted a pretrial evidentiary hearing to determine the admissibility of the testimony of Albee and Wildman about the information they had obtained from Hamilton. The court heard extensive testimony from Special Agent Schulte, Hamilton, Hamilton's trial attorney, Wildman, Wildman's attorney, and two of Hamilton's former cellmates. Judge Crabb ruled, first, that Wildman was not acting as a government agent when he learned about the Wisconsin bank robbery from Hamilton at the Dane County Jail and then divulged that information to the FBI. Judge Crabb also made a factual finding that, although Hamilton had written down information regarding his defense strategy, he also talked "very freely" for "many hours" to Wildman about the details of the case. (R. 91, at 206.) As a result of these voluntary disclosures, Judge Crabb held that Hamilton had waived any attorney-client privilege he had regarding the information.
 
 
 7
 At trial, the government presented twenty witnesses in support of its case. Bank teller Debra Jackson identified Miller and Hamilton in court as the two men who had held up the bank. (R. 126, at 95.) Special Agent Robert Fram, a hair and fiber expert from the FBI laboratory in Washington, D.C., testified that hairs found in a ski hat retrieved along the escape route of the bank robbers had identical microscopic characteristics to the head hair of Robert Miller. (R. 134, at 162.) The government presented testimony that a white Mazda similar to that owned by Miller was observed being driven away from the bank after the robbery (R. 127, at 47); that the Hamiltons and Millers had departed Burnett County on the day of the robbery, leaving behind new furniture and a $300 security deposit (R. 134, at 186, 192); and that the Hamiltons and Millers made expensive purchases during their trip to Arizona. (R. 127, at 118-30.) In addition, William Albee testified that while he was confined with Hamilton at the Minnesota State Prison, Hamilton admitted robbing a bank in Wisconsin. (R. 132, at 35-63.) Alan Wildman also testified about his discussions with Hamilton regarding the bank robbery. (R. 132, at 88-107.) Finally, Jennifer Miller testified that Robert Miller had admitted to robbing the bank with Hamilton, and that Hamilton had carried a gun during the crime. (R. 127, at 125; R. 128, at 21.)
 
 
 8
 The jury convicted both Hamilton and Miller of aggravated bank robbery. On May 4, 1993, Hamilton was sentenced to 190 months' imprisonment; Miller to 158 months. We affirmed Hamilton's conviction and sentence. United States v. Hamilton, 19 F.3d 350 (7th Cir.), cert. denied, 115 S.Ct. 480 (1994).
 
 
 9
 On May 4, 1995, Hamilton filed in the district court a "Motion for Dismissal of Charges or New Trial" under Federal Rule of Criminal Procedure 33. Hamilton made two claims. First, he claimed that he had unearthed new evidence which demonstrated that jailhouse informant Alan Wildman was actually a government "agent" when Hamilton made incriminating statements to him at the Dane County Jail. Second, he argued that he had obtained a letter dated January 17, 1995 from Jennifer Miller recanting her trial testimony. The district court denied the motion.
 
 DISCUSSION
 
 10
 Rule 33 of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." We review a district court's denial of a motion for a new trial based on newly discovered evidence for an "abuse of discretion." United States v. Severson, 49 F.3d 268, 271 (7th Cir.1995). " 'We approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury.' " United States v. Theodosopoulos, 48 F.3d 1438, 1448 (7th Cir.) (quoting United States v. DePriest, 6 F.3d 1201, 1216 (7th Cir.1993)), cert. denied, 116 S.Ct. 191 (1995).
 
 I. Gary Kammerud's Testimony
 
 11
 On appeal, Hamilton renews his argument that "new evidence" shows that Alan Wildman acted as a government agent when he obtained information about Hamilton's defense strategy and then passed on this information to the FBI. This new evidence, Hamilton argues, consists of testimony given on November 17, 1992 by inmate Gary Kammerud, a government informant who testified in an unrelated proceeding, United States v. Proulx, 92-CR-73-C. In that proceeding (also before Judge Crabb), Kammerud, who had become acquainted with Wildman at the Dane County Jail, testified that a cellmate (who Hamilton insists can only be identified as Wildman) had information about certain Wisconsin murders and bank robberies, and that the cellmate in fact had spoken about this information with the FBI.[2] Hamilton argues that Kammerud's testimony in Proulx proves that up until the date Kammerud testified--November 17, 1992--Wildman had been gathering information on Hamilton, and that Wildman had already turned over some of this information to the government. As a result, Hamilton reasons, Wildman and others perjured themselves at Hamilton's evidentiary hearing when Wildman denied being an agent of the government.
 
 
 12
 A. Factual Background Regarding Alan Wildman
 
 
 13
 To review the district court's determination that Alan Wildman was not a government agent when he furnished the FBI with information obtained from Hamilton, we first examine the chronology of Wildman's relationship with the government. In early November 1992, Wildman and his attorney Kris Thomas attended a debriefing session with Assistant United States Attorney Chris Van Wagner and two agents from the Dunn County Sheriff's Department and the West Central Drug Unit. Van Wagner testified that he told Wildman to provide truthful and accurate historical information in response to the agents' questions about Wildman's own activities. Attorney Thomas corroborated Van Wagner's account, asserting that the debriefing provided "all the information about all the criminal activity [Wildman] was aware of at that time." (R. 91, at 192.) Thomas added that "[w]e didn't talk about future activity because I didn't anticipate anything would be coming up in the future since he was incarcerated." Id. at 192-93. Thomas emphasized that she did not ask Wildman to "try to get more information on others." Id. at 193.
 
 
 14
 In late December 1992, Wildman pled guilty to the cocaine conspiracy charges. After the plea hearing, Wildman informed Thomas for the first time about Hamilton's bank robbery and the threats Hamilton had made about Special Agent Schulte and his family. Shortly thereafter, Thomas conveyed Wildman's information to Van Wagner, who, in turn, passed on the information to the prosecutor assigned to the case, Kevin Potter. At Potter's request, Special Agent Schulte obtained permission from Thomas to interview Wildman on January 6, 1993. After Schulte's interview, Hamilton and Wildman were immediately separated.
 
 
 15
 In May 1993, Judge Crabb granted Wildman a four-level downward departure under U.S.S.G. § 5K1.1 and sentenced him to 87 months' imprisonment. Wildman, however, believed that his cooperation warranted more than a four-level departure and thus moved under 28 U.S.C. § 2255 to withdraw his guilty plea. An evidentiary hearing was held on the motion before Judge Crabb. Wildman testified that the government had promised him that he would not have to serve jail time and that he would be placed in the witness protection program. (R. 169, at 27-28.) Judge Crabb, however, denied Wildman's motion. Finding his testimony "not to be credible," she rejected Wildman's argument that he had misunderstood his plea agreement at the time he pled guilty. (R. 168, at 84, 86.)
 
 
 16
 B. Hamilton's Motion for New Trial Based on Newly Discovered Evidence
 
 
 17
 The parties disagree as to what legal test this court should use to assess Hamilton's motion for new trial based on newly discovered evidence. Hamilton refers us to a three-part test this court has employed when the government used perjured testimony. Under that test, a new trial is warranted if the defendant establishes that (1) the government's case included perjured testimony; (2) the government knew or should have known of the perjury; and (3) there is any likelihood that the false testimony could have affected the judgment of the jury. United States v. Ferguson, 35 F.3d 327, 331-32 (7th Cir.1994), cert. denied, 115 S.Ct. 1832 (1995); United States v. Adcox, 19 F.3d 290, 295 (7th Cir.1994); United States v. DePriest, 6 F.3d 1201, 1216 & n. 6 (7th Cir.1993) (citing United States v. Guadagno, 970 F.2d 214, 220 (7th Cir.1992)).
 
 
 18
 The government urges us to apply the more stringent test set forth in Larrison v. United States, 24 F.2d 82 (7th Cir.1928). The Larrison test has been applied in cases where the new trial motion is premised on allegedly false testimony:
 
 
 19
 [A] new trial should be granted when,
 
 
 20
 (a) The court is reasonably well satisfied that the testimony given by a material witness is false.
 
 
 21
 (b) That without it the jury might have reached a different conclusion.
 
 
 22
 (c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.
 
 
 23
 Id. at 87-88. Accord United States v. Reed, 2 F.3d 1441, 1451 (7th Cir.1993), cert. denied, 114 S.Ct. 898 (1994); Olson v. United States, 989 F.2d 229, 231 (7th Cir.), cert. denied, 114 S.Ct. 258 (1993); United States v. Reed, 986 F.2d 191, 192-93 (7th Cir.1993); United States v. Mazzanti, 925 F.2d 1026, 1029 & n. 2 (7th Cir.1991).[3] The government contends that the Larrison test is applicable here because Hamilton bases his claim upon inconsistencies in testimony that Wildman presented at Hamilton's February 1993 trial and at a September 1994 evidentiary hearing on Wildman's own § 2255 motion.
 
 
 24
 We need not choose between these slightly different tests because each requires finding that a witness's false testimony affected the jury's verdict.[4] Here, the weight of the evidence of Hamilton's guilt was so overwhelming that the jury would have convicted him with or without Wildman's testimony. Wildman was just one of many witnesses that testified in the government's case. The district court, which heard all the evidence and saw Wildman testify on several occasions,[5] found Wildman's testimony not to be credible unless corroborated by other evidence:
 
 
 25
 The reality is that Wildman is a manipulator who will say anything he thinks will help him. His testimony at Hamilton's hearing and at Hamilton's trial was believable only because it was corroborated in critical respects by other credible evidence. His testimony at his own evidentiary hearing was not credible because it had no similar corroboration and was contradicted by the testimony of the other witnesses. To believe Wildman's testimony that he was a government agent when he talked with Hamilton would require believing a person whose sole motivation at the hearing was to get a better sentencing deal that [sic] he had received two years earlier. Wildman's only interest was to portray himself as someone who had rendered unusual service to the government and had been denied the sentencing concessions he had been promised. To believe Wildman's testimony would require ignoring all of the contradictory evidence of agent Schulte, United States Attorney Potter, Assistant United States Attorney Van Wagner, and his own attorney.
 
 
 26
 (R. 163, at 10-11.)
 
 
 27
 The government presented substantial evidence at trial. William Albee testified that Hamilton confided that he had robbed the Wisconsin bank. Bank teller Debra Jackson identified both Miller and Hamilton as the bank robbers. Special Agent Fram testified that hairs from the inside of the ski hat found along the robbers' escape route matched Robert Miller's hair. A white Mazda resembling that owned by Miller was spotted driving away from the bank after the robbery. The Hamiltons and the Millers fled Burnett County, Wisconsin the day of the robbery, leaving behind brand new furniture and a $300 security deposit. Jennifer Miller testified that Robert Miller confessed that he and Hamilton robbed the bank, and that Hamilton carried a gun during the robbery. Finally, the Hamiltons and Millers spent large amounts of money in Arizona despite having no apparent income source.
 
 
 28
 Because Wildman's testimony did not affect the jury's verdict, Hamilton is not entitled to a new trial on the basis of Gary Kammerud's testimony.[6]
 
 II. Jennifer Miller's Recantation
 
 29
 Next, Hamilton claims that he is entitled to a new trial based on the January 17, 1995 letter from Jennifer Miller in which she recants her trial testimony inculpating Hamilton. Jennifer Miller testified at trial that Robert Miller confided that he and Hamilton had robbed a bank, and that Hamilton had been armed during the robbery. (R. 127, at 125; R. 128, at 21.) Jennifer also testified that Monica Hamilton, John's wife, threatened to kill her and her daughter if she testified against John Hamilton. (R. 128, at 18-19.) Jennifer further testified that Monica Hamilton and John Hamilton, Sr. had forced her to give a tape recorded statement accusing Special Agent Stanley of making sexual advances toward her. Id. at 17-18. Jennifer also testified that John Hamilton, Sr. had promised her that she would not have to worry about having a place to live if she would not testify. Id. at 21. Jennifer also testified that neither Special Agent Stanley, id. at 106-108, nor any member of the prosecution, id. at 141, had coached her about what to say.
 
 
 30
 Nearly two years after trial, however, in a letter to Robert Miller dated January 17, 1995, Jennifer Miller wrote that she was "finally able to freely tell [him] the truth." (R. 152, ex. 2.) She stated in the letter that (1) her trial testimony about the bank robbery was based upon information provided to her by Special Agents Jack Schulte and Jeff Stanley of the FBI; (2) the agents and the United States Attorney had threatened her with prosecution and imprisonment if she did not testify as directed; (3) she had made the tape for John Hamilton, Sr. of her own free will; and (4) she had lied about John Hamilton, Sr.'s offer to reward her if she did not testify; and (5) Monica Hamilton never had threatened to kill her or her daughter.
 
 
 31
 To win a new trial based on recanted testimony, a defendant must show (1) that the recantation is true; (2) that the jury might have reached a different result had the witness not testified falsely; and (3) that the witness's false testimony took the defendant by surprise. United States v. Walker, 25 F.3d 540, 549 (7th Cir.) (citing United States v. Olson, 989 F.2d 229, 231 (7th Cir.1993)), cert. denied, 115 S.Ct. 371, and cert. denied, 115 S.Ct. 531 (1994). We view recantations skeptically. Olson, 989 F.2d at 231.
 
 
 32
 Initially, we note that Hamilton has not demonstrated that Jennifer Miller's recantation is trustworthy. As the district court observed, Hamilton "cannot show that Jennifer Miller's recantation is any more truthful than her previous statements, which have see-sawed from one story to another." (R. 163, at 11-12.) After reviewing the record, we also share the government's view that Jennifer Miller's testimony at trial, which was subject to extensive cross-examination, was corroborated in many respects by several other witnesses. Furthermore, it is unlikely that Jennifer Miller's testimony at trial took Hamilton by surprise. Miller's testimony was foreshadowed by her prior interview statements with FBI agents and by her prior grand jury testimony that was available to Hamilton. The district court properly denied the motion for a new trial.
 
 CONCLUSION
 
 33
 For the foregoing reasons, we AFFIRM the district court's denial of Hamilton's motion for a new trial.
 
 
 
 *
 This successive appeal has been submitted to the original panel under Operating Procedure 6(b). The panel heard oral argument on the initial appeal and is unanimously of the view that a second argument is unnecessary
 
 
 **
 The Honorable Daniel M. Friedman, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Although Jennifer Miller referred to herself at trial as Robert Miller's wife, the two were not legally married because she had not been divorced from her previous spouse before her marriage to Robert Miller
 
 
 [2]
 Kammerud testified on cross-examination in Proulx as follows:
 Q And you also mentioned that you might be able to solve some robberies and some murders and some importation scheme to bring drugs into the prison.
 A That's incorrect. I said that I had a person with information on that I was in the same cellblock with that could give this information. I did not have the information myself.
 Q You talking about just the prison situation then?
 A And the murders and the robberies. It was a person that was in my cellblock. I don't know anything about any of that stuff. He just told me that if I did talk to them [FBI], that he was interested in giving them that information.
 (R. 152, at 19.) Later, during "redirect," Kammerud testified:
 Q The information that you were or that Mr. Wylde asked you about the robberies, murders, and some multiple Kilos,--
 A Right.
 Q --where did you learn that information?
 A I knew the guy that was moving cocaine in Minnesota through somebody that I knew, and I met him through that. And the guy that knew about the murders and bank robberies that he said that happened in Wisconsin or around Wisconsin, I was in prison with him. And he told me that he would be willing to give the FBI that information if I would relay the information to the FBI, which I did. And I'm positive and I know for a fact that the FBI did go and talk to the man.
 Id. at 19-20.
 
 
 [3]
 This court has also used a third test to determine whether newly discovered evidence warrants a new trial. Under that test, the defendant must demonstrate that the evidence at issue (1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial. United States v. Veras, 51 F.3d 1365, 1375 (7th Cir.), cert. denied, 116 S.Ct. 540 (1995); United States v. Severson, 49 F.3d 268, 271 (7th Cir.1995); United States v. Theodosopoulos, 48 F.3d 1438, 1448 (7th Cir.), cert. denied, 116 S.Ct. 191 (1995); United States v. Gootee, 34 F.3d 475, 479 (7th Cir.1994); United States v. Young, 20 F.3d 758, 763 (7th Cir.1994)
 
 
 [4]
 In light of Hamilton's inability to show that Wildman's testimony affected the jury's verdict, we do not reach the question whether Wildman's testimony at Hamilton's trial was in fact false
 
 
 [5]
 Judge Crabb observed Wildman testify at Hamilton's evidentiary hearing and trial, as well as at Wildman's own evidentiary hearing on his § 2255 motion
 
 
 [6]
 Hamilton also argues that the government's failure to disclose evidence of Wildman's status as a government agent, including details about the Kammerud testimony, violated Brady v. Maryland, 373 U.S. 83, 87 (1963). We are not persuaded, however, that the government and Wildman had an agency relationship. The record shows that Wildman gathered information on his own, without any agreement from the government that he would be rewarded if he elicited incriminating evidence from Hamilton. Wildman was "an independent entrepreneur looking out for the main chance," Judge Crabb concluded after Hamilton's evidentiary hearing in February 1993 (R. 163, at 9), and she reaffirmed that conclusion in denying Hamilton's subsequent motion for a new trial. This conclusion is not clearly erroneous. See United States v. Li, 55 F.3d 325, 328 (7th Cir.1995) (district court's factual finding that person who elicited incriminating statements from defendant was not a government agent is reviewed for clear error). The government had no exculpatory information to disclose; accordingly, Hamilton's Brady claim must fail. In any event, disclosure of the Kammerud testimony would not have made any difference to the outcome of the trial. See Veras, 51 F.3d at 1374 (to obtain new trial under Brady claim, defendant must show that evidence that was not disclosed by prosecution was favorable, suppressed, and material to case)