UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JAMES COURY HOLMES,
*Defendant-Appellant.*

No. 00-4728

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MARCUS MANDEL ELLIS,
*Defendant-Appellant.*

No. 00-4738

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CR-00-107)

Argued: November 2, 2001

Decided: March 21, 2002

Before WIDENER, WILKINS, and TRAXLER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Richard Dwight Biggs, LAW OFFICE OF MARCIA G. SHEIN, P.C., Decatur, Georgia, for Appellant Holmes; David Garri-

son Hill, HILL & HILL, L.L.C., Greenville, South Carolina, for Appellant Ellis. E. Jean Howard, Assistant United States Attorney, Greenville, South Carolina, for Appellee. **ON BRIEF:** Marcia G. Shein, LAW OFFICE OF MARCIA G. SHEIN, P.C., Decatur, Georgia, for Appellant Holmes. Scott N. Schools, United States Attorney, Greenville, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Appellants James C. Holmes and Marcus M. Ellis were convicted by a jury of four counts of armed bank robbery, *see* 18 U.S.C.A. § 2113(a), (d) (West 2000), and four counts of using and carrying a firearm in relation to a crime of violence, *see* 18 U.S.C.A. § 924(c)(1)(A) (West 2000). Holmes and Ellis received prison sentences of 1,057 months and 1,135 months, respectively. They challenge their convictions on multiple grounds.

### I.

Holmes and Ellis contend that the evidence was insufficient to sustain the jury's verdict. In assessing the sufficiency of the evidence of a criminal conviction on direct review, we must sustain the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80 (1942). Substantial evidence means "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

With regard to the bank robbery charges, the government was required to prove that the defendants took money or property from a

bank "by force and violence, or by intimidation," 18 U.S.C.A. § 2113(a), and that in doing so they used a dangerous weapon to "assault[ ] any person" or "put[ ] in jeopardy the life of any person." 18 U.S.C.A. § 2113(d). On the firearms charges, the government was required to prove beyond a reasonable doubt that the defendants used or carried a firearm during and in relation to the bank robberies. *See* 18 U.S.C.A. § 924(c)(1). We conclude that the evidence was clearly sufficient to sustain the jury's guilty verdict on each count of the indictment.

A.

The government presented overwhelming evidence showing that, between May 1998 and December 1999, two men committed armed robbery of four banks located in Greenville, South Carolina, using the same *modus operandi* each time. In each instance, two men entered the target bank carrying dark, assault-type rifles and wearing ski masks, gloves and layers of clothing such as sweatshirts, which gave a bulky appearance. During each robbery, one of the two robbers stood guard at the door and maintained control over customers and bank employees who were forced to lie down. The other robber went to the counter, ordered bank employees to open drawers or vaults and collected the money. Employees of a branch of American Federal Bank, which was hit twice during the string of robberies, testified that the robberies occurred "in the exact same manner by the exact same dress with a difference of a sweat shirt color," that the robbers "sounded exactly the same," J.A. 243, and that the weapon one of the robbers carried looked the same in both cases. In all four cases, the robbers fled the scene in a vehicle that had been stolen from an apartment complex in the Greenville area. Each of these four robberies occurred on a Friday, and Holmes's employment records established that he was absent from work on each of these days. Ellis's work records showed he was absent from work on the day of the last robbery in December 1999; there were no work records for Ellis covering the time period during which the other three banks were robbed.

The physical stature and race of the two bank robbers in each of the four robberies, as captured on video tape or as described by eyewitnesses to each robbery, matched that of Holmes and Ellis. Expert testimony established, through photogrammetric analysis of the sur-

veillance videotape from all four robberies, that the robber who collected the money was between 5′10-1/2″ and 5′10-3/4″tall, while the robber in the lobby was slightly shorter, standing between 5′9-1/2″ and 5′10″ tall. Holmes measures 5′10-1/4″ tall and Ellis is slightly shorter at 5′9-3/8″ tall. Eyewitness testimony also placed the robbers within a few inches of Holmes's and Ellis's actual height, and was remarkably consistent on this point.

A search of Holmes's residence turned up, in addition to specific evidence of the individual robberies that is summarized below, evidence of his involvement in the robbery spree. Officers recovered numerous articles of clothing, including sweat pants and shirts, that were stained with red dye. The stains were tested and found to be consistent with the red dye used in bank dye packs. The search also produced a large number of ski masks, as well as a bent screwdriver. Each of the stolen cars was found missing the ignition switch; one of the owners testified that as a result, she was forced to use a screwdriver to start her car. A search of Holmes's car revealed two assault-style rifles similar to the ones carried during the bank robberies, as described by eyewitnesses and as revealed by videotape.

B.

Additionally, there was substantial evidence directly linking Holmes, Ellis, or both defendants, to each of the four robberies. Coupled with the evidence described above, which links Holmes to the *modus operandi* employed during each robbery, and Ellis's confession, the evidence of guilt was overwhelming.

The first armed robbery occurred on May 1998 at a branch office of Carolina First Bank, and was committed by two men in the manner described previously. Eyewitness testimony about the race and physical stature of the robbers matched testimony about the other three robberies. The branch manager testified that one of the guns carried during the robbery "had wood grain," J.A. 502, as did one of the assault weapons recovered from Holmes's car. Shortly before the Carolina First robbery, a white Ford Mustang was stolen from an apartment complex in the general area of the bank. A witness outside of the bank saw two individuals arrive at the bank in a small white car and go inside. Both were wearing ski masks and carrying rifles. Bank

employees testified that $8,749 in cash and dye packs were placed into a bag carried by the robbers. Bank employees saw the robbers flee the scene in a white Mustang, and still other witnesses saw two men in a white Mustang retrieve a bag of money that had been dropped on a street near the bank. After the robbers retrieved the bag, witnesses recovered dye-stained currency that had fallen out of the bag. The white Mustang was found by the police the next day; the ignition switch had been removed so that the car could be started only with a screwdriver. Ellis's fingerprint was lifted from the license plate of the Mustang, and Holmes was absent from work on the day of this robbery.

The next robbery occurred on February 5, 1999, at a branch of American Federal Bank. Again, two individuals of Holmes's and Ellis's approximate stature robbed the bank using the same method employed in the May 1998 robbery. Both were armed with large rifles and were wearing ski masks and several layers of clothing. The robbers escaped with approximately $100,000 in a stolen white Mustang convertible, which was found immediately after the robbery. Officers also found numerous articles of clothing, including ski masks and sweatshirts, strewn along the road leading up to where the car had been abandoned. Finally, Anthony Blassingame testified that he pleaded guilty to aiding and abetting Holmes and Ellis in the commission of armed bank robbery of the American Federal Bank on Friday, February 5, 1999. Blassingame told the jury that on the day of the bank robbery, he received a page from Holmes and Ellis, picked them up and drove them from Greenville to Atlanta. Holmes was absent from work on this day as well.

The third Greenville area bank — Branch Banking & Trust Company ("BB&T") — was robbed in November 1999 by two individuals using the same *modus operandi*, wearing the same disguises, carrying semiautomatic rifles, and fitting the same general physical characteristics as Holmes and Ellis. The robbers stole approximately $50,000, and fled in a Ford Thunderbird that had been stolen not long before the robbery. The car was later found, with the ignition switch missing. A search of Holmes's residence revealed various items stolen from BB&T in the November 1999 robbery, including various coins and silver certificates. BB&T money straps bearing the date of this rob-

bery were discovered in Holmes's coat pocket. Holmes was again absent from work on this day.

Finally, in December 1999, an armed robbery similar to the first three occurred at the same American Federal branch that had been robbed in February 1999. Dye packs and bait bills were put into the robbers' bag along with cash. The two robbers fled with approximately $87,000 in cash. American Federal employees who were present during both robberies testified that they "had been robbed in the exact same manner by the exact same dress with a difference of a sweat shirt color here and there in February, and they sounded exactly the same. He said the same words over again." J.A. 243. An employee also testified that the rifles carried by the robbers were similar to those carried during the February 1999 robbery of American Federal. Witnesses outside of the bank saw two individuals wearing hooded sweatshirts fleeing the bank in a dark Thunderbird. Another witness near the bank observed two African-American males driving a black Thunderbird with red smoke coming from inside of the car. The witness was able to observe that the red smoke was coming from a bag held by one of the occupants. The robbers soon abandoned the car and fled on foot.

By this time, Holmes was a suspect in the robberies. Officers set up surveillance at Holmes's residence immediately after the December American Federal robbery was reported. Less than an hour after the robbery, officers saw Holmes carry a black bag into his residence. After Holmes drove away, officers stopped him and searched his car. A search of the trunk turned up two loaded semi-automatic assault rifles similar to those used in each of the robberies, and a bag containing loaded magazines for the assault rifles. Wallets containing Holmes's and Ellis's identification were found in the console of the vehicle. Finally, Ellis's fingerprint was lifted from the door of Holmes's car.

Officers then searched Holmes's residence and found a black tote bag stained with red dye. The tote bag contained approximately $87,000 in currency, including bait bills taken in the December American Federal robbery. A bent screwdriver was discovered, as were dye-stained articles of clothing, including sweat shirts, pants and 10 or more ski masks. Once again, Holmes was absent from work this

day. Work records for Ellis showed that he was absent from work as well.

The Government offered expert testimony, based on a photogrammetric study of the videotapes, that one of two assault rifles recovered from a vehicle that Holmes was driving, a K-5 MAK-90, shared the same class characteristics as a weapon used by the robbers in at least three of the robberies. The other weapon recovered, a Bushmaster Bullpup, shared the same class characteristics as a weapon used in at least one of the robberies.

Finally, the Government introduced Ellis's confession to the robberies through two witnesses. Agent John Spees testified that Ellis admitted that he was "responsible for" the December 1999 robbery. J.A. 184. However, Ellis would not admit to the other three robberies and he refused to identify specifically who his accomplice was in the December 1999 robbery. Ellis told Agent Spees that the dye pack exploded in the getaway car and that he and the other individual switched to Holmes's car, which Ellis had borrowed the previous evening. Ellis told Agent Spees that he dropped off the other person and then called Holmes. The Government also presented the testimony of Ronell McMillan, Ellis's fellow inmate after Ellis was arrested for the robberies. Ellis told McMillan that he had robbed three to five banks via a method similar to that used in the four Greenville bank robberies. Ellis told McMillan that he had the same "partner" for each armed robbery.

## C.

Viewed in a light most favorable to the government, the evidence is overwhelming from which a jury could have concluded beyond a reasonable doubt that Holmes and Ellis were the culprits behind all four bank robberies. With respect to Holmes, there is either direct evidence or strong circumstantial evidence of his involvement in each of the robberies. We conclude that there was sufficient evidence to support the jury's guilty verdict on each count as to Holmes. With respect to Ellis, the evidence of his guilt on each count is substantial, in addition to the fact that Ellis confessed to authorities his participation in the last robbery and admitted to inmate McMillan that he had committed a string of similar bank robberies. Thus, we likewise conclude

that there was sufficient evidence to support the jury's guilty verdict on each count as to Ellis.

## II.

Holmes challenges the admission of the testimony of Ronell McMillan, Ellis's cellmate. Holmes failed to object to this evidence at trial. Accordingly, our review is for plain error. *See United States v. Olano*, 507 U.S. 725, 731-32 (1993).

First, Holmes argues that the district judge violated *Bruton v. United States*, 391 U.S. 123 (1968), by permitting McMillan's testimony. McMillan testified that while he was in detention with Ellis, Ellis admitted being involved in a string of bank robberies, indicated that he had "a partner in the bank robberies," and said that the "partner was the same for all of the robberies." J.A. 594.

*Bruton* teaches us that the Sixth Amendment prohibits the use, at a joint trial, of an out-of-court confession by a nontestifying defendant against his or her codefendant if the confession directly incriminates the codefendant as well. *See Bruton*, 391 U.S. at 126. But, "[a] *Bruton* problem exists only to the extent that the co defendant's statement in question, *on its face*, implicates the defendant." *United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994) (emphasis added). As long as the nontestifying defendant's statement does not on its face inculpate the codefendant, it is admissible — even it if it becomes incriminating when linked with other evidence. *See Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987).

Holmes argues McMillan's testimony that Ellis confessed to having a "partner" directly implicated him because there were only two defendants on trial and the jury had already learned that incriminating evidence had been discovered at Holmes's house. Thus, according to Holmes, the admission of Ellis's jailhouse confession violated the principles set forth in the *Bruton* line of decisions.

We disagree. Ellis's statement to McMillan was not facially incriminating. As Holmes's argument acknowledges, McMillan's testimony must be linked to other evidence in order to incriminate

Holmes. The term "partner" is a neutral reference that, within the context of Ellis's confession to his cellmate, did not directly implicate Holmes. *See United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir. 1999) (holding that there was no Sixth Amendment violation when the court admitted a codefendant's confession that stated "another person" was involved in the crime). Accordingly, we conclude that McMillan's testimony did not violate Holmes's Sixth Amendment rights under *Bruton*, and the district court did not commit plain error by allowing the testimony.

Second, Holmes challenges McMillan's testimony on the grounds that it was inadmissible hearsay and should not have come into evidence against him. We reject this argument as well. Ellis's statement to McMillan qualifies as a statement against interest under Federal Rule of Evidence 804(b)(3). *See United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that nontestifying codefendant's statement to cellmate that he and the defendant robbed a bank fell within Rule 804(b)(3)). Accordingly, the district court did not commit a plain error by allowing this testimony.

Furthermore, even if the district court committed a plain error by allowing McMillan to testify, Holmes has not carried his burden of demonstrating that the error "affect[ed] [his] substantial rights." *Olano*, 507 U.S. at 732 (internal quotation marks omitted). Holmes contends that McMillan's testimony was prejudicial because there was no direct evidence that Holmes was ever in any of the banks and that Ellis's purported statement was the only evidence putting Holmes inside the banks.

This plainly is not so. Essentially the same evidence came in through Agent Spees with respect to the December 1999 robbery of American Federal. First, Agent Spees testified that Ellis told him that there was "another person" involved in the December 1999 robbery but would not reveal the identity. Holmes does not challenge the admission of this statement. Second, the evidence discovered in Holmes's residence and car, as well as Blassingame's testimony, provides overwhelming evidence of Holmes's involvement in the other robberies and his connection with Ellis.

Finally, even if McMillan's testimony could be said to affect Holmes's substantial rights, we would decline to notice the error in

light of this overwhelming evidence. *See United States v. Bowens*, 224 F.3d 302, 315 (4th Cir. 2000) (declining to notice a plain error where the evidence of guilt is overwhelming), *cert. denied*, 532 U.S. 944 (2001).

III.

Holmes and Ellis contend that the government's closing statement was filled with improper argument. The primary complaint is that the United States Attorney, throughout his closing argument, indirectly commented on the decision of each defendant not to testify. One example cited by the defendants is the prosecutor's comment about Holmes's absence from work during each of the four robberies and Ellis's absence during the last robbery: "Now, there may be a reasonable explanation for them being absent from work. They may have been sick. They may have been at a funeral. But that's one more circumstance that begs for explanation." J.A. 736. The prosecutor used the phrase "maybe there's a reasonable explanation" in commenting on the evidence several times during his closing, *e.g.*, "maybe there's a reasonable explanation [for all of the ski masks discovered in Holmes's house]. Maybe he's having a Halloween party in the middle of December." J.A. 739.

The defendants did not object to these comments at trial. Accordingly, our review is only for plain error. *See Olano*, 507 U.S. at 732. To determine whether the prosecution has, through an indirect remark, improperly commented on a defendant's failure to testify, we must determine whether "the language used [was] manifestly intended to be, or was . . . of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify[.]" *See, e.g.*, *United States v. Francis*, 82 F.3d 77, 78 (4th Cir. 1996) (internal quotation marks omitted). These comments, viewed within the context of the government's entire closing argument, were not a comment on the failure of the defendants to testify. In response to defense counsel's opening statement that most of the evidence would be circumstantial, the prosecutor was merely highlighting the fact that each individual piece of circumstantial evidence had only one reasonable explanation when viewed in light of all of the evidence linking the string of bank robberies to the defendants. Remarking on the failure of the defense, as opposed to the defendant, to

counter or explain the evidence is not impermissible comment on the defendant's failure to testify. *See United States v. Knowles*, 66 F.3d 1146, 1162-63 (11th Cir. 1995) (finding no error in the prosecutor's rhetorical question to the jury "Did you ever hear an explanation for that?"). We find that the prosecutor's comments in this case are directed at the failure of the defense to offer an explanation rather than the defendants' failure to take the witness stand and testify. Moreover, to the extent the prosecutor's comments had the effect of drawing attention to the defendants' failure to testify, we find that the comments did not prejudice Holmes's or Ellis's substantial rights so as to amount to plain error, nor do we perceive any other improprieties in the government's closing that would amount to plain error.

IV.

Holmes and Ellis raise three additional arguments. First, the defendants argue that the district court erred when it permitted the government to present expert testimony, based on the videotapes from the banks' security cameras, that the semiautomatic assault rifles discovered in Holmes's car were of the same class and kind as those used in the robberies. The defendants contend that this testimony was neither reliable nor helpful to the trier of fact. *See United States v. Barnette*, 211 F.3d 803, 815 (4th Cir. 2000). We fail to discern any reversible error by the district court in this regard. However, even if the district court erroneously permitted this testimony, the error was harmless. *See* Fed. R. Crim. P. 52(a). In considering whether a non-constitutional error is harmless, the question is whether the appellate court can determine "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *see United States v. Ince*, 21 F.3d 576, 583 (4th Cir. 1994). There was overwhelming testimony from eyewitnesses to each of the robberies describing rifles similar to at least one of the rifles found in the trunk of Holmes's car, and there was surveillance videotape showing that the robbers carried weapons with them. Given the impressive amount of evidence that Holmes and Ellis committed these robberies and that they were carrying rifles when they did it, the admission of the photogrammetric analysis of the weapons was harmless error, if it was error at all.

Second, the defendants contend that the district court improperly permitted the jury to use a magnifying glass during its deliberations. Although a jury is not permitted to conduct experiments to obtain information or develop facts not in evidence, "the mere making of a more critical examination of an exhibit than was made during the trial is not objectionable" and "the use of a magnifying glass not introduced in evidence . . . is not reversible error where such action involves merely a more critical examination of an exhibit." *United States v. Beach*, 296 F.2d 153, 158-59 (4th Cir. 1961) (internal quotation marks omitted). The defendants have failed to explain how the jurors could have developed, through the use of a magnifying glass, new evidence outside of that introduced at trial. This claim is meritless and we reject it.

Finally, Holmes contends that he received ineffective assistance of counsel in violation of the Sixth Amendment, *see Strickland v. Washington*, 466 U.S. 668 (1984), because his trial counsel failed to adequately investigate potential alibi witnesses and failed to object to McMillan's testimony or the government's closing argument. Holmes also believes that counsel should have moved for a severance from Ellis. An ineffective assistance of counsel claim is not cognizable on direct appeal and should be raised in a motion under 28 U.S.C.A. § 2255 "unless it conclusively appears from the record that defense counsel did not provide effective representation." *United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999) (internal quotation marks omitted). We have reviewed the record and find that it does not conclusively demonstrate, if it all, that counsel for Holmes was deficient in his performance.

V.

For the foregoing reasons, we affirm the defendants' convictions.

*AFFIRMED*