28 A.3d 110

**Roland CHARLEAU**

v.

**STATE of Maryland.**

**No. 2644, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Sept. 2, 2011.

Juan P. Reyes (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Jessica V. Carter (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellant.

Panel: EYLER, JAMES R., MATRICCIANI, CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

After a jury trial in the Circuit Court for Montgomery County on November 3 through 5, 2009, appellant Roland Charleau was found guilty of robbery with a dangerous weapon, robbery, and conspiracy to commit robbery. The jury acquitted appellant of conspiracy to commit robbery with a dangerous weapon. The trial judge sentenced appellant to incarceration of ten years for each count, to be served concurrently. Appellant filed a timely appeal, raising the following two questions:

I.   Did the trial court err in denying appellant's motion for a new trial?

II.  Was the evidence legally sufficient to support appellant's conviction for robbery with a dangerous weapon?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant's charges arise from the robbery of B.J.'s Beer and Wine located on Goshen Road in Gaithersburg. According to the testimony of Sung Lim, on May 16, 2009, he was working alone as the cashier when two black males entered the store around noon. Mr. Lim could not see their faces, because each was covered with a handkerchief. The first man to enter the store, described as the "big guy," pointed a gun at Mr. Sim and said, "where is your money and I'm not kidding." A "skinny guy" entered about a minute later.

Mr. Sim testified that he handed them some money, and when told to open the cash register, he complied, and the men placed the contents in a black plastic bag from underneath the register. The men then asked "where the video tape's at," and when told, one of the men tried to grab the video camera. Mr. Sim was instructed to get down on the ground, so he did so. He was not sure which of the two robbers was speaking to him at the time. When shown exhibit photographs, Mr. Sim described what was happening in each photograph, and identified the "big guy" with a gun. According to Mr. Sim, the men took over $600 in cash.

Montgomery County police responded to Mr. Sim's call. Montgomery County Police Officer David Grimm testified that he responded to a report of armed robbery at B.J.'s Beer and Wine on May 16, 2009, at approximately 12:45 p.m. While he was speaking with Mr. Sim, a woman—later identified as Lakesha Akinsada, appellant's wife—came to the store. She approached Officer Grimm, and handed him several checks and deposit slips belonging to the store. Officer Grimm called for other units to assist him in responding to Ms. Akinsada's residence at 9425 Eagleton Lane, located less than a half mile from the place of the incident. At the residence, appellant's wife showed the officer two photographs of appellant. She also granted Officer Grimm and his colleagues permission to search the house, but the suspects were not located.

Appellant's co-defendant, Dante Craven, testified that he was with appellant at the Owings Mills Mall in Baltimore

County when they were arrested for the robbery of B.J.'s. After his arrest, Craven signed his advice of rights form and voluntarily spoke with the officers in Rockville. Although he initially denied any involvement with the robbery, Craven eventually admitted that he was one of the two robbers. He entered into a plea agreement with the State, and, pursuant to the agreement, he pleaded guilty to conspiracy to commit armed robbery and agreed to testify truthfully in appellant's trial. At the time of the trial, he had already entered his guilty plea.

Craven testified that he and appellant talked about robbing the beer and wine store before doing so. When the robbery took place, appellant was the one with the handgun. After the robbery, they first went to appellant's home on Eagleton Lane, and then to Baltimore, in a rented car, for the purpose of getting out of Montgomery County. At trial, Craven was shown several photographs, and asked to describe who and what was in each photograph. With the aid of the photographs, Craven testified that appellant was first to enter the store, holding the handgun. Both men covered their faces with bandanas to avoid identification, and both were wearing gloves. Appellant went behind the counter as he told the cashier to open the register. As appellant pointed the gun at the cashier, Craven assisted in getting the money out of the register and putting it in a black plastic bag from the store, which also contained receipts.

Detective Mark Hayden testified that he interviewed Craven after his arrest, and that no promises, threats or plea agreements were made in exchange for his confession. Detective Hayden stated that he first brought up appellant's name in the interview, and asked Craven whether he had been involved in the robbery with appellant. After initially denying his own involvement, however, Craven confessed that he was involved in these robberies with appellant. Detective Hayden also pointed out that the photographs revealed that both appellant and Craven wore gloves during the robbery, and testified to the differences in height and weight between appellant and Craven.

Montgomery County Police Detective Roger St. Louis testified that on May 19, 2009, his unit received information that appellant and Dante Craven were in the Owings Mills Shopping Center. They responded in plain clothes, and located the two men in a phone store. After appellant and Craven exited the store, the detectives placed them under arrest. Craven initially resisted arrest, and he had to be tased. Detective St. Louis's job was to transport appellant back to Montgomery County. He testified that while they were driving down Route 95, appellant asked if he would take $10,000 to let him out of the vehicle. After the detective laughed and rejected the offer, appellant then raised the amount to $20,000. Detective St. Louis testified that he said no and just kept driving.

Detective Grant Lee of the Montgomery County Forensic Services testified that on May 20, 2009, he processed a 2003 Chevrolet Cavalier in relation to the robbery of a beer and wine store. During his search of that car, he located appellant's driver's license and an Express Rent–A–Car rental agreement showing that the car had been rented to appellant several days earlier.

Appellant's 15 year-old step-daughter, Bridgette Akinsade, testified that on the morning of the robbery, her mother and appellant had an argument, after which her mother left the house. She later saw appellant and Craven walking out of the house together. At that time, appellant was drinking a beer out of a black plastic bag with the name of a liquor store on it.

At the close of the State's evidence, appellant moved for judgment of acquittal, which was denied. Appellant called his sister-in-law, Sharita Howard–Wilson, who was living at 9425 Eagleton Lane on the date of the robbery. She testified that she and appellant had a 45–minute conversation that began shortly before noon on the day of the robbery, and that Craven came to the house. Howard–Wilson testified that there was only a ten minute period (while she was taking a shower) between 11 a.m. and 1 p.m. during which she did not see appellant.

The jury returned a verdict of guilty on the following three counts: armed robbery, robbery and conspiracy to commit robbery, and a verdict of not guilty on the count of conspiracy to commit armed robbery.

On November 16, 2009, appellant filed a motion for a new trial, which argued that he was deprived of a fair trial. He based this argument on facts uncovered by his trial counsel during a conversation with two jury members in the courtroom lobby after the verdict was reached. Appellant averred that "[t]hese jurors indicated to counsel that another one of the jurors was a professional photography analyst and that the analyst provided the other jurors with magnifying equipment during deliberations." According to appellant, the jurors indicated that the equipment, together with the expertise of this juror, "was decisive in the jury's deliberations." On the basis of this information, appellant maintained that he was deprived of a fair trial. In response, the State indicated that, during the conversation, the jurors had also described several other considerations which led to their verdict, including the changing "mood" of the jurors during deliberations.

On January 6, 2010, prior to sentencing, the trial judge reviewed appellant's motion for a new trial based, and the following colloquy occurred:

DEFENSE COUNSEL: [T]he jury based its decision on analysis and conclusions and expertise that came outside of what was presented in this room, what was presented at trial and on the record.

What was heard at trial and on the record did not relate to a detailed analysis of the photograph. The State did not argue even that "Look at this picture. It kind of looks like Mr. Charleau" or anything like that and there was certainly no expert who came in who said, well, using some kind of magnification technique, I can determine that this person matches certain characteristics of Mr. Charleau. That was not the focus of the State's case.

But what came out in a discussion that jurors had when I was present and when the State's Attorney was present,

was that, in fact, one of the jurors had some kind of expertise in this issue or on this topic or at least purported expertise, held himself out in the jury room as an expert in this and brought in some kind of equipment. Whether a magnifying glass, it appeared to be a magnifying glass or something of that nature, and that with that equipment and with his expertise they were able to blow up this picture in the jury room and then draw conclusions from that, and apparently one juror was able to or purported to say that his expertise allowed him to conclude that the person in the picture was in fact Mr. Charleau.

After hearing arguments from both parties, the trial court noted that it was an issue to be taken seriously, and reached the following conclusion:

THE COURT: I think we need to be clear on the record exactly what type of analysis needs to be done in this case. This is not a case where there is an allegation that the jurors were in any way approached by a third party during the course of their deliberation. Nor is there an allegation that extrinsic evidence was introduced in the midst of their deliberations. For example, there's not an allegation that one of the jurors had gone out and pulled a [b]unch of stuff off the internet about photo analysis or whatever and brought that in for the jury to consider.

As I understand the allegation in this case, and I think it is significant, what the specific allegation is. Although we have no specific information, the allegation is that in general one of the jurors allegedly had claimed to have some expertise in analyzing photos and brought in a magnifying glass and made it available to other jurors to use it in looking at the photo which was in evidence. So the photo looked at was already evidence in the case.

And when that is the case, it's not necessarily, well, I guess it's sort of an allegation of juror misconduct in the sense that they used a magnifying glass which was not provided by the Court or used during the course of the trial.

And I think the test for the Court to consider is can a fair and impartial [t]rial be had under these circumstances. It's not a case where there is any type of presumption because of inappropriate third party contact or any kind that there might be a presumption that their verdict was based on something other than just the evidence.

And looking at the case law that was cited by the Court, there is no specific Maryland case on this thing and I do also, I just need to be clear, that we don't know anything about who this juror was or what the basis of his alleged experience was in looking at photographs. We have absolutely no information on that . . . . .

But in almost every trial sometimes photos are published to the jury by passing them around; sometime they are published by being put on the Elmo which does in fact blow up the photos, if you will, or enhance them. In this trial they were shown to the jury on an Elmo but the jurors did not have the opportunity to individually examine that photo in any detail until they were provided with all of the evidence when they were in fact deliberating in this case.

My opinion in this case is that no prejudice has been shown to the defendant and that he's unable to show any prejudice. The jurors were themselves, among themselves, examining the actual evidence in the case and the fact that a magnifying glass which enhanced it differently perhaps than the Elmo did, was used solely to examine the actual evidence in the case. I'm unable to find that in any way prejudicial to the defendant or render the jury's verdict other than fair and impartial.

Based on this reasoning, the trial court denied the motion for a new trial, and this appeal followed. Additional facts will be provided as necessary.

## DISCUSSION

### 1. *Juror Misconduct*

Appellant argues that the trial court erred in denying his motion for a new trial. He points out that, pursuant to

Maryland Rule 4-326(b) (2010), a magnifying glass is not among the listed items that may be brought into the jury room, and he points to cases in which appellate courts overturned verdicts because jurors brought impermissible items with them into the room during deliberations. However, each case in which a trial judge's failure to grant a new trial was reversed based on an abuse of discretion, the appellate court determined that a defendant was prejudiced by the jury's use of the unauthorized item. We do not believe that appellant was prejudiced in this case. We explain.

In *Hebb v. State*, 44 Md.App. 678, 685, 410 A.2d 622 (1980), in which this Court overturned a verdict based on the jury's use of *Maryland Criminal Jury Instructions and Commentary* during deliberations, this Court was clear to explain that "the Court of Appeals has held more than once that '[t]he decision by the trial court in the exercise of its discretion denying a mistrial will not be reversed on appeal *unless it is clear that there has been prejudice to the defendant.*'" 44 Md.App. at 683, 410 A.2d 622 (quoting *Wilhelm v. State*, 272 Md. 404, 429, 326 A.2d 707 (1974) (emphasis supplied in *Hebb*)). Because the book on jury instructions was not part of the evidence, but was a "treasurehouse of confusion and misinformation if given to a jury for its perusal without any constraint," and because the instructions in the book differed from those actually given to the jury, we reversed the judgment. 44 Md.App. at 684-85, 410 A.2d 622.

In his brief, appellant points to the decision of the Supreme Court of Washington in *State v. Burke*, 124 Wash. 632, 636-37, 215 P. 31 (1923), in which the Court reversed the lower court's denial of a motion for new trial after jurors were provided with a magnifying glass during deliberations, without knowledge of the court. The jurors used the magnifying glass to find and compare dust particles on several hacksaws allegedly used in a bank robbery. In doing so, they uncovered new evidence not admitted at trial, and "came to the scientific conclusion" that the dust was the same, and based their guilty verdict upon their conclusions. 124 Wash. at 637, 215 P. 31.

In reaching its decision to reverse the verdict, the Court wrote:

> If the effect of such an experiment is to put the jury in possession of evidence which should have been but was not offered [in] the trial, it is not permissible, *but if the experiment involves merely a more critical examination of an exhibit than had been made of it in the court, there is no ground of objection.*

*Id.* (Emphasis added).

Because there are no factually analogous Maryland cases, we shall look to several cases from other jurisdictions to guide our decision. The Supreme Court of Washington faced another case involving a juror's impermissible use of a magnifying glass during deliberations less than ten years later in *State v. Everson,* 166 Wash. 534, 7 P.2d 603 (1932). In that case, the walking stick of the deceased was introduced into evidence in a manslaughter case, and some or all of the jurors used a magnifying glass to examine it more carefully. 166 Wash. at 535, 7 P.2d 603. The Court refused to reverse the verdict, concluding that "the jury merely more critically examined [the walking stick] by the aid of a magnifying glass. This did not put them in possession of material facts which were not already in evidence." Rather, the Court compared their use of the glass to jurors' use of their reading glasses to examine the end of the stick, which nobody would question would be proper. "In using a magnifying glass rather than a reading glass, the only difference would be the greater magnifying power of the former." *Id.* at 537, 7 P.2d 603.

Likewise, in *United States v. Brewer,* 783 F.2d 841, 843 (9th Cir.1986), the Court rejected an appellant's contention that the trial court should have declared a mistrial because the jury used a magnifying glass, without court approval, to examine photographic evidence. The Court concluded that it could not "accept the characterization of the magnifying glass used by the jury as extrinsic evidence," and was "unable to see how the use of the magnifying glass to view photographs differs from the use of corrective eyeglasses by jurors."

Similarly, in *United States v. Holmes,* 30 Fed.Appx. 302, 310 (4th Cir.), *cert. denied,* 537 U.S. 873, 123 S.Ct. 284, 154 L.Ed.2d 124 (2002), in which the Fourth Circuit noted the difference between obtaining new information or facts not in evidence, and in merely taking a more critical examination of exhibits already in evidence. The Court wrote: "The defendants have failed to explain how the jurors could have developed, through the use of a magnifying glass, new evidence outside of that introduced at trial. This claim is meritless and we reject it." *See also United States v. George,* 56 F.3d 1078, 1084 (9th Cir.1995) (declining to find jury misconduct and holding that no "new evidence" resulted from jurors' use of magnifying glass to examine fingerprint cards and gun); *United States v. Miranda,* 986 F.2d 1283, 1286 (9th Cir.1993) (finding no misconduct in jury's use of magnifying glass after trial court denied enlargements of photos); *Cooks v. Hickman,* 48 Fed.Appx. 272, 273 (9th Cir.Cal.2002) (finding unpersuasive a claim that jury engaged in misconduct by using a magnifying class to look at photographic evidence); *Commonwealth of Pennsylvania v. Lilliock,* 740 A.2d 237, 243 (Pa.Super.1999) (magnifying glass compared to the use of video presenter used during trial to allow jury to better view the photographs); *State v. Shoemaker,* 112 Kan. 805, 808, 212 P. 890 (Kan.1923) (holding that no jury misconduct occurred where the jury procured two magnifying glasses, took them to the jury room, and used them to examine a check that had allegedly been forged, and reasoning that "[i]n no sense could it be said the jury received evidence not authorized by the court, unless the glasses were of such power and the condition of the paper were such that invisible, unerased portions of the [check] were rendered visible," and that "what occurred may have been no more than if a juror, with magnifying lenses in his spectacles, had allowed his fellows to use them.).

In the case before us, the trial court properly considered whether the jury's use of a magnifying glass allowed them to have access to information that would not otherwise be available to them, such as conversations with a third party or use of the internet to access information. Although a magnifying

glass is not on the list of permissible items set forth in Rule 4–326, neither are eyeglasses on that list, and it cannot be denied that many jurors require the use of reading glasses to examine items in evidence.

Appellant also argues that the juror's self-professed expertise in photo analysis influenced the jury without the benefit of cross-examination, resulting in undue prejudice. When individuals are selected for jury service, however, and they retire to determine the verdict, they are not directed to leave their experience and knowledge at the door. Rather, the contrary is true. In the case before us, the trial court instructed the jury as follows:

> In evaluating this evidence, you should consider it in light of your own experiences. You may draw any reasonable inferences or conclusions from the evidence that you believe to be justified by common sense and your own experiences.

As the State maintained in its brief, "[t]here would be no cause to complain if a juror who was a medical doctor, for example, used his or her training and experience as a doctor in evaluating the evidence during jury deliberations." Likewise, there are many ways in which a person may have experience in image enhancement, which range from enlarging photos to working in a laboratory. For these reasons, we conclude that the trial court did not abuse its discretion in refusing to grant a new trial.

### 2. *Sufficiency of Evidence*

■ Appellant next argues that the evidence was insufficient to support his conviction for robbery with a dangerous item because the State failed to prove, beyond a reasonable doubt, that the weapon used in the robbery was genuinely capable of inflicting harm, and because the case "rested entirely upon the testimony of Mr. Craven," whose testimony was not sufficiently corroborated. The State maintains that because appellant failed to raise his second argument during his motion for judgment of acquittal, this issue is not preserved, and cannot be raised for the first time on appeal. *See*

Maryland Rule 4–324(a); and *State v. Rich*, 415 Md. 567, 574 (2010).

The Court of Appeals recently reiterated the standard of review for a claim of legal insufficiency:

We examine the record solely to determine whether 'any rational trier of fact could have found the essential elements of the crime[ ] beyond a reasonable doubt.' In so doing, '[i]t is not our role to retry the case.' Rather, '[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence.' We defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence.

*State v. Mayers*, 417 Md. 449, 466 (2010) (citing *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002), and *Smith v. State*, 415 Md. 174, 185, 999 A.2d 986 (2010)).

Assuming appellant's sufficiency of the evidence argument was preserved, his contention that the case was based solely upon the uncorroborated testimony of his accomplice, Craven, is simply not supported by the record. The record contained more than ample evidence by which a rational jury could have found the essential elements beyond a reasonable doubt. This evidence included, *inter alia*, the testimony of the store clerk, Mr. Sim; the stipulated fact that appellant's wife returned stolen receipts and checks shortly after the robbery took place; the fact that appellant lived a short distance from the store, but was found with Craven three days later in Owings Mills; Detective St. Louis's testimony that appellant offered him money for his freedom while being transported back to Montgomery County; appellant's step-daughter's testimony regarding his possession of a black plastic bag from a liquor

store after the robbery; and several photographs taken from the surveillance video in the store.

■  Although appellant argues that the State failed to prove that the gun used in the robbery was real, it cannot be denied that this Court has "considered and upheld numerous convictions where no tangible evidence was presented at trial establishing the use of a handgun, and it is well settled that circumstantial evidence alone will often suffice." *Curtin v. State,* 165 Md.App. 60, 71–72, 884 A.2d 758 (2005) (evidence "sufficient to support a finding that a 'real' gun was involved" for armed robbery, use of a handgun in the commission of a crime, and first degree assault), *aff'd,* 393 Md. 593, 903 A.2d 922 (2006). *See also Brown v. State,* 182 Md.App. 138, 166–67, 957 A.2d 654 (2008) ("[T]angible evidence in the form of a weapon is not necessary to sustain a conviction; the weapon's identification can be established by testimony or inference"); *Brown v. State,* 64 Md.App. 324, 337, 494 A.2d 999 (1985) (proof of gun may be by inference when more direct empirical evidence not available). *Compare, Brooks v. State,* 314 Md. 585, 600, 552 A.2d 872 (1989) (Where toy gun, entered into evidence, was used in robbery, defendant was improperly convicted for armed robbery because toy gun not a dangerous or deadly weapon).  In the case before us, because the actual weapon was not recovered, proof of the gun was made through circumstantial evidence.  We conclude that such evidence was sufficient to support appellant's conviction.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**